# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **RUBY CARR**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No: 2:07cv532-MHT |
| vs. | ) | |
| | ) | |
| **ALABAMA DEPARTMENT** | ) | |
| **OF YOUTH SERVICES**, | ) | |
| | ) | |
| Defendant. | | |

## MOTION TO DISMISS AND BRIEF IN SUPPORT

The Alabama Department of Youth Services, through counsel, moves to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b), on the grounds that it fails to state a cause of action on which relief could be granted.  In support whereof, the Defendant submits the following:

The EEOC Charge of Discrimination Alleges Time Barred Discrete Acts.

The Charge of Discrimination alleged discrete acts outside the statutory time limit. An examination of the Charge of Discrimination, (attached hereto as Exhibit A), reveals 3 discrete act allegations: (1) termination on June 23, 2006, (2) alleged failure to comply with the terms of an October **2005** settlement agreement, and (3) an allegedly unaddressed "grievance" filed April 7, 2006.  All of those discrete

acts were complete when they "occurred"[1], but were not made a part of a timely

EEOC Charge of Discrimination.  They are therefore untimely now.  Such

untimely discrete acts cannot be revived by a timely act (in this case the

discharge), or linked together to form part of a continuing violation.  *See, United*

*Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977);

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete

---

[1] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002). The analysis apparently requires the Court to distinguish "discrete acts" that have "occurred" in the past from acts that occur over a period of time.  It appears that discriminatory acts which do not independently create a cause of action are generally the latter, however, the undersigned is unable to identify case law delineating a test for discrete acts.  This Court has previously identified factors to distinguish discrete act violations from continuing or recurring violations.  That analysis may still be instructive:  One critical factor in making the distinction is whether the elements necessary to prove the claim can be found based on evidence within the limitations period.  *See, Beasley v. Alabama State University*,  966 F.Supp. 1117, 1129 (MD Ala. Thompson J. 1997).  Obviously the second and third claims in Ms. Carr's EEOC Charge of Discrimination (failure to comply with the settlement agreement and failure to answer Ms. Carr's grievance) were provable, if at all, based on evidence prior to the limitations period–not within it.  This Court has also identified additional factors including the subject matter and permanence of the discriminatory acts. *See Waltman v. International Paper Co.*, 875 F.2d 468, 475 (5th Cir.1989). Permanence is measured by whether the act should trigger an employee's awareness and duty to assert his rights, and whether the consequences of the act would continue absent an ongoing intent to discriminate. *Id.* at 476. Based on Ms. Carr's own pleading, Ms. Carr complained that she was being retaliated against, and therefore her awareness was clearly triggered, shortly after October 2005, and complained about every act in the complaint thereafter, (Complaint, paragraph 18, 22, 24, and 25). The complaint alleges that Ms. Carr described the "harassment and retaliation" to Dr. Stewart in both a memorandum and a "grievance" on May 5, 2006 and May 9, 2006.  This clearly shows Ms. Carr's awareness was triggered outside the limitations period.  Moreover, the consequences of the alleged failure to comply with the settlement agreement and the consequences of the alleged failure to answer Ms. Carr's grievance would continue without regard to an ongoing intent by the Defendant to discriminate against Ms. Carr.  Thus, not a single indicia relating to the sometimes "down right ethereal" task , *Gibbons v. Auburn University at Montgomery*, 108 F.Supp.2d 1311, 146 Ed. Law Rep. 1052, (MD Ala., Thompson J. 2000), of determining whether a claim is discrete or continuing favors the latter.

acts that fall within the statutory time period do not make timely acts that fall outside the time period"). The statute of limitations runs from each discrete act of retaliation and is absolute. *Johnson v. Stein Mart, Inc.,* Slip Copy, 2007 WL 1796265 (DC Fla., June 20, 2007), citing *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S.Ct. 2162, 167 L.Ed.2d 982, 75 USLW 4359, (2007) (holding that where employee alleges a series of EEOC violations, the 180-day statute of limitations runs from each discrete act); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Thus, the Plaintiff's discrete act claims alleged in the Charge of Discrimination fail as a matter of law.

 The Plaintiff Failed to Exhaust Administrative Remedies of a Continuing Violation.    Before filing a Title VII action, a plaintiff must file an EEOC Charge of Discrimination. *See Gregory v. Georgia Department of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004). This requirement gives the EEOC "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Id.,* quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983). A plaintiff's complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir.1994).

If the Plaintiff intends to pursue a continuing violation theory, her claim cannot succeed under any set of facts because she failed to exhaust her administrative remedies.  Nowhere in the Charge of Discrimination did the Plaintiff mention a continuing action.  *See* Exhibit A.   In addition, the complaint is chock full of allegations that were nowhere mentioned in the Charge of Discrimination and could not reasonably have been the subject of investigation of the claims made therein.  If the additional allegations stated in the complaint but not made in the Charge of Discrimination are an attempt to tack on a continuing violation claim to the untimely discrete claims stated in the Charge of Discrimination, the attempt is futile.  The claims in the complaint far exceed the discrete claims alleged in the EEOC Charge of Discrimination, which never mentioned a continuing action theory, and are therefore barred.

There Is No Present Violation on Which To Base A Continuing Violation.
As discussed above, the EEOC Charge of Discrimination alleged discrete acts that are not actionable.  In addition, the Complaint alleges a series of allegedly discriminatory acts not included in the Charge of Discrimination reaching years into the past.  The only theory on which the Plaintiff could rationally argue those past acts are not time barred is the "continuing violation" theory which was not presented to the EEOC as discussed above.  However, in addition to the requirement that the violation be "continuing", that theory depends on the

existence of a present violation.  *See, United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (stating "the critical question is whether any present violation exists.")   As discussed below, there is no possible claim for discriminatory discharge based on an EEOC Charge of Discrimination filed a year and three months earlier.  As a matter of law there is no present violation on which to base a continuing violation claim.

The Allegations Fail To Establish A Continuing Violation Relating Back to Protected Activity.  Even if Ms. Carr had exhausted her administrative remedies, which she did not, and even if the time between the protected activity and the discharge were close enough to establish a nexus (see below), the complaint alleges only a broken or non-continuous series of acts.  For example, paragraph 20 of the complaint clearly alleges that on March 20, 2006, her supervisor, whom Ms. Carr alleges retaliated against her for a previous EEOC charge, gave her a "satisfactory review" for which "no negative comments were made by her supervisor with regard to this review."   The allegations in the complaint, even if they had been included in the Charge of Discrimination, which they were not, are woefully insufficient to establish a continuous series of discrimination.  There is no alleged unbroken pattern of conduct relating back a total of one year and three months to the filing of her EEOC Charge of discrimination.  Thus, taken in the light most favorable to the Plaintiff, the Complaint, including the unexhausted

claims, alleges no nexus between the alleged discriminatory treatment and the protected activity. They are wholly unrelated and no set of facts could exist under which a nexus could be shown.

    <u>No Nexus Betweeen the Protected Conduct and the Plaintiff's Discharge.</u> The only claim in the Complaint that has been exhausted and is not barred by the statute of limitations alleges retaliatory discharge. That obviously discrete act claim fell within the statute of limitations. However, the protected conduct for which Ms. Carrr alleges she was retaliated occurred not months, but a <u>year and three months</u> before her discharge. A plaintiff in a retaliation case must show, at a minimum, a temporal link between a protected activity and an adverse employment action. *E.g. Hammons v. George C. Wallace State Community College*, 174 Fed.Appx. 459 (11th Cir. 2006) (holding that five months was insufficient to show causal nexus); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (holding that a 7-month time period is too indirect to satisfy the causal connection requirement); *Breech v. Ala. Power Co.*, 962 F.Supp. 1447, 1461 (S.D.Ala.1997), aff'd 140 F.3d 1043 (11th Cir.1998) (holding that more than a year between the protected activity and the discharge is not close enough to support the causal connection requirement). As a matter of law, there is no nexus between the protected conduct and the discharge which occurred approximately a year and three months later. As discussed above, the non-

actionable information in the Complaint that could only be background information is simply insufficient to establish a causal link.  The complaint, on its face, thus fails to allege a cause of action for which relief could be granted.

Frivolous Claims.  The Defendants are entitled to costs and attorneys' fees for defending this frivolous lawsuit. The Plaintiff filed this suit solely for the purpose of harassment in continuation of her pattern.  (See Exhibit B attached hereto).  The Complaint in this case makes factual claims diametrically opposite from her sworn claims in a previous administrative proceeding.  Her previous testimony in the administrative proceeding was under oath and the pursuit of the claims in this Complaint will require Ms. Carr to commit perjury.  This lawsuit is a sham and a fraud on the Court and the Plaintiff should be sanctioned.

WHEREFORE, the complaint is due to be dismissed because it fails to state a cause of action on which relief could be granted.

Respectfully submitted

TROY KING
ATTORNEY GENERAL

s/ T. Dudley Perry, Jr.
T. Dudley Perry, Jr.
Bar Number: 3985-R67T

Deputy Attorney General
Alabama Dept of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail: dudley.perry@dys.alabama.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August, 2007, I electronically filed the forgoing **MOTION TO DISMISS AND BRIEF IN SUPPORT**, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Guy D. Chappell III
3100 Independence Drive; Suite 200
Birmingham, AL 35209

s/T. Dudley Perry, Jr.
T. Dudley Perry, Jr.
Deputy Attorney General
Alabama Department of Youth
Services

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Walter Wood<br>Executive Director<br>ALABAMA DEPT OF YOUTH SER<br>P O. Box 66<br>Mount Meigs, AL 36057 | **Ruby H. Carr** |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**420-2007-01091** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act      [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act      [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **13-JAN-07** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **28-DEC-06** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033** If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| | |
|---|---|
| **Debra B. Leo,**<br>**ADR Coordinator**<br>*EEOC Representative*<br><br>*Telephone*    **(205) 212-2146** | **Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

### See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **December 13, 2006** | **Delner Franklin-Thomas,**<br>**District Director** | *Delner Franklin-Thomas*<br>*(RRH)* |

RECEIVED
DEC 1 8 2006
EXECUTIVE DIRECTOR'S OFFICE

*Enclosure with EEOC*
*Form 131 (5/01)*

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEPA | 420-2007-01091 |
| [X] EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* <br> Ruby H. Carr | HOME TELEPHONE *(Include Area Code)* <br> (334) 864-0576 |
|---|---|
| STREET ADDRESS     CITY, STATE AND ZIP CODE <br> 5211 County Road 28    Lafayette, AL 36862 | DATE OF BIRTH <br> 06-22-1965 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

| NAME <br> Alabama Department of Youth Services | NUMBER OF EMPLOYEES, MEMBERS <br><br> 500+ | TELEPHONE *(Include Area Code)* <br> (334) 215-3807 |
|---|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE <br> 100 Industrial Road    Mt. Meigs, AL 36057 | COUNTY <br> Montgomery | |
| NAME | | TELEPHONE *(Include Area Code)* |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY    DEC - 8 2006 | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* <br><br> [ ] RACE    [ ] COLOR    [ ] SEX    [ ] RELIGION    [ ] NATIONAL ORIGIN <br> [X] RETALIATION    [ ] AGE    [ ] DISABILITY    [ ] OTHER *(Specify)* | DATE DISCRIMINATION TOOK PLACE <br> *Earliest*        *Latest* <br>                6/23/2006 <br> [ ] CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I am an African American female citizen of the United States. I was employed with the Alabama Department of Youth Services for seven years as a Youth Services Aide until my unlawful termination on June 23, 2006. The reasons given for my termination were "failure to perform properly, insubordination and disruptive conduct. I believe that my termination was in retaliation for me filing a prior EEOC charge in March 2005 (130-2005-01900) and the settlement of same in October 2005.

In March, 2005, I filed a Charge of Discrimination based on race and sex discrimination and retaliation against Respondent. At the time of my filing, Tracy Smitherman, a white female, was my supervisor. She remained my supervisor until June 23, 2006. As a result of that charge, I entered into a negotiated Settlement Agreement ("Agreement") with Respondent in October, 2005. I believed that the terms of the Agreement

*CONTINUED ON THE NEXT PAGE*

| [ ] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
|   <br> Date *Dec, 7, 2006*     *Ruby H. Carr* <br> Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |

## ADDITIONAL PARTICULARS:

would curtail the discriminatory and retaliatory treatment I was subjected to that altered the terms and

conditions of my employment. However, the retaliation continued shortly after entering into the

Agreement.

First, Respondent failed to comply with all of the terms of the Agreement. Provision

6(A) (1) a & b of the Agreement provides as follows:

> a. "The adjustment of Ruby H. Carr's record to reflect forty (40) hours of annual leave for the week of July 5-9, 2004; restoration of any leave or pay deducted for June 28, 2004 and June 29, 2004; <u>removal of the disciplinary actions from Ruby H. Carr's record regarding the failure to report to work dated June 30 and July 1, 2004; re-evaluation and restore Ms. Carr's complete appraisal for the following period of: September 1, 2003, and August 11, 2004;</u>
>
> b. <u>The removal of all three subsequent reprimands for acts of insubordination (Failure to Meet with Ms. Rankins) from Ruby H. Carr's personnel file;</u>"

(emphasis added). On several occasions, I inquired as to whether Respondent had complied

with all of the terms of the Agreement. I was aware that the leave time in section "a" had been

restored, but to my knowledge, Respondent had failed to comply with the remaining terms.

Respondent clearly failed to remove the negative information outlined above from my

personnel file at the Mt. Meigs facility and the one retained by the State of Alabama Personnel

Department ("State") in Montgomery. The "reprimands for acts of insubordination (Failure to

Meet with Ms. Rankins)" were never removed from my personnel file at Mt. Meigs. I also

never received a "re-evaluation and restor[ation of my] complete appraisal for the period of

September 1, 2003, and August 11, 2004." Additionally, all documents regarding the "removal

of the disciplinary actions from [my] record regarding the failure to report to work dated June

30 and July 1, 2004" were also never removed from my personnel file with the State. The

failure to complete the re-evaluation and restoration of my appraisal and the failure to remove

the negative information from my file, coupled with the retaliatory treatment I to which I was

subjected following the signing of the Agreement led to my unlawful dismissal on June 23, 2006.

On March 20, 2006, I received a mid-appraisal which indicated that I had "performed competently in all 6 areas of responsibility." On April 7, 2006, I filed a letter of grievance after being accused by Smitherman of violating ethical rules. The concerns outlined in my grievance were never addressed. On several occasions I asked for a response to my grievance from the John Stewart, a white male and Smitherman's immediate supervisor, J. Walter Wood, a white male and the Executive Director, and Eddie Johnson, a black male and Chairman of the DYS School Board. The retaliation only escalated. To date, my grievance remains unresolved. Because of the allegations surrounding an alleged violation of ethical rules, my personnel file containing the negative information which remained in violation of the Agreement was reviewed and used as justification for the unfounded reasons given for my termination.

I believe Respondent has retaliated and discriminated against me in the terms and conditions of my employment solely because of my previous charge of discrimination. I believe I am entitled to reinstatement to my former position, back pay, front pay, interest, attorney's fees, costs and liquidated, compensatory and punitive damages.

Ruby H. Carr

DEC 18 2006

12/7/2006

3

## CONSENT TO MEDIATION

The employer is in receipt of Charge No._____ filed by _____
_____ against _____. The employer is interested in resolving this charge through Equal Employment Opportunity Commission's (EEOC) Alternate Dispute Resolution (mediation) process.

We understand that if the charge is selected for mediation, the charge will be mediated by the EEOC ADR Administrator who is a certified mediator or another neutral mediator who is not employed by the Commission.

We understand that the mediation process is voluntary and non-binding. We understand that either the Charging Party or Respondent may opt out of mediation at any time without adversely affecting the way the EEOC will process the charge. If the charge is not resolved through mediation, it will be processed through EEOC's charge processing procedure. Should the charge be resolved through mediation, the EEOC will terminate its processing of the charge. The approximate time for the ADR process is sixty (60) days.

We understand that the mediation process is confidential. The employer will not disclose any information discussed within the mediation process or the outcome of the mediation process. The employer does authorize the mediator to disclose to the EEOC's Birmingham District Office the final results of the mediation process and any benefits received by the complainant. This information is reported for ADR program evaluation purposes only.

If the charge is selected for mediation, the employer agrees to cooperate with the EEOC and the mediator toward resolving the charge.

_____          _____
Signature for the Respondent                    Date



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

The above-referenced charge is about to begin the long investigative and legal adjudication process. At this point, the Equal Employment Opportunity Commission invites both parties to pause and seriously consider the possibility of resolving the disagreement through Alternative Dispute Resolution (ADR).

Mediation focuses on a resolution of the underlying dispute by addressing the interests of both parties. It is not a form for reaching a determination on whether discrimination occurred. Therefore, any agreement reached during mediation does not constitute an admission that discrimination occurred.

*There is no fee for mediation. If you are interested in resolving this complaint through mediation, you do not need to provide a position statement or requested documentation at this time. If a resolution is reached, an agreement will be signed and the case will be closed. The Charging Party will not be issued a Notice of Right to Sue.*

If a charge is not resolved during the mediation process, you will then respond to the charge and it will be processed just like any other charge. Since the entire mediation process is strictly confidential, information revealed during the mediation session cannot be disclosed to anyone including other EEOC personnel. Therefore, it cannot be used during any subsequent investigation.

Please return the signed form within ten (10) days of your receipt of this notice to begin the mediation process.

**ADR FAX: (205) 212-2025**

# ⒸCOPY

## BEFORE THE STATE PERSONNEL BOARD
## IN THE MATTER OF

RUBY CARR,                          )
                                    )
    **Appellant,**                 )
                                    )
v.                                  ) 06-031-jjw
                                    )
ALABAMA DEPARTMENT OF               )
YOUTH SERVICES,                     )
                                    )
    **Appellee.**                  )

## RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD

The undersigned conducted a hearing on September 19, 2006, at the offices of State Personnel located in Montgomery, Alabama. Jason L. Manasco, Esq. appeared as counsel on behalf of Ruby Carr (hereinafter "Carr" or "the Employee"). Dudley Perry, Esq. appeared on behalf of the Alabama Department of Youth Services (hereinafter "DYS" or "the Department").

The Department introduced 16 exhibits consecutively numbered as 1-16.[1] The Employee identified five exhibits, however, they were also included within the Department's exhibits, so they were not introduced separately.

The witnesses testifying at the hearing were:

(1) Ruby Carr;

(2) Tracy Smitherman, the Employee's supervisor at DYS;

(3) Queen A. Barker, a special education coordinator for DYS; and

---

[1] The undersigned redacted from the exhibits, the Employee's social security number to protect the Employee's privacy. The parties have not asked for any other documents to be placed under seal.

1



(4) Dr. Sojuan Crenshaw, a technical educational coordinator at DYS.

## I. PROCEDURAL HISTORY AND CHARGES

The Department employed Carr as an Administrative Support Assistant I (hereinafter "ASA I") beginning in June of 1999. Thereafter, Carr's position changed from Administrative Support Assistant to Youth Services Aide. Carr remained in that position until her termination in June, 2006.

On May 16, 2006, the Department held a pre-disciplinary conference to discuss the allegations and charges. In a letter dated June 23, 2006, the Executive Director, J. Walter Wood (hereinafter "Wood") advised Carr of her termination effective June 23, 2006. As grounds for the termination, Wood stated the Employee violated Rules of the State Personnel Board concerning the failure to perform her job properly, disruptive conduct and insubordination.

The Employee timely appealed the termination to the Alabama State Personnel Board on or about June 30, 2006.

The undersigned held a pre-hearing conference at the earliest possible date for both parties on July 25, 2006. At the pre-hearing conference the undersigned set the matter for hearing on September 19, 2006, a date agreed upon by both parties.

## II. FACTUAL BACKGROUND

DYS maintains five (5) schools across the state. Tracy Smitherman (hereinafter "Smitherman") plans and coordinates curriculums for DYS students.[2]

---

[2] DYS employed Smitherman beginning in 1997, thus Smitherman has worked for the Department for approximately 9 years.

Smitherman's job description also includes the responsibility to work with the schools which DYS children routinely attend, distribute property and inventory, work with teachers regarding matters such as license renewals and certification, and other related duties.

DYS assigned Carr as an administrative assistant to Smitherman specifically for the purpose of assisting with these duties sometime in 2005. Smitherman supervised Carr for approximately one year prior to Carr's termination. From the onset of Carr's assignment to Smitherman, they discussed Carr's responsibilities and general work requirements. During the course of Smitherman's initial meeting with Carr, Smitherman discussed Carr's future performance and duties such as filling out reports such as federal grant awards and statistics, the use of technology, calculating data, general interaction with various local state and federal entities, Carr's responsibility to read through correspondence and reports, filing and to assist with property inventory. DYS assigned Carr only to Smitherman, however, Carr could be permitted to work with other individuals at Smitherman's discretion if time permitted.[3]

Smitherman testified that at some point, her relationship with Carr began to deteriorate, beginning with Carr's refusal to cooperate regarding assigned tasks. Carr claimed to have too many job assignments and asked to be relieved of some of them. Carr claimed time simply did not permit her to perform all the matters assigned to her. As a result, in January, Carr sent a memorandum to her supervisor

---

[3]  Smitherman's testimony and Carr's performance appraisals. Carr disputes that she was assigned to Smitherman yet little evidence corroborates Carr's position.

stating that she did not intend to continue to handle her property inventory assignments any longer.[4]  Rather than create an argument with Carr, Smitherman decided to comply with her request and remove property and inventory responsibilities from Carr.[5]  Thereafter rather than performing the tasks that Smitherman requested, often Carr took the initiative to help others with their duties instead.  Ironically, Carr complained to have too many responsibilities under Smitherman's direction, yet at the same time claimed to have plenty of time to assist other employees with their assignments.  Since Carr apparently demonstrated an inability to prioritize Smitherman's assignments, Smitherman instructed Carr that some duties were not her responsibility and directed her to refocus her priorities.  While Carr initially complied with this instruction prior to January 23, 2006, Carr apparently resented being given these instructions.  Carr did not discuss her resentment with Smitherman prior to January 23, 2006.

However, after January 23, 2006, Carr began to refuse to perform various assignments Smitherman gave her.  Additionally, Carr began to take it upon herself to demand equipment or office supplies, regardless of whether these items were necessary for her duties.  Also, even though her job description provided absolutely no discretionary authority to appropriate equipment, Carr took it upon

---

[4] DYS Ex. 3. Carr did not write a request to be relieved of a duty, but rather issued a statement that she had decided she would no longer perform the duties related to property and inventory. Carr wrote Smitherman stating in part: "Due to circumstances that are beyond my individual control I feel that it is necessary as of this day, January 23, 2006 that I relinquish any and all responsibility of maintaining the Property Inventory Register for DYS School District 210... I am submitting to you copies of the Property Inventory Register & documentation.... Also, I am removing the (2) Gateway Laptop Computers from my office. I do not feel that it is necessary that we meet to discuss anything concerning DYS School District 210 Property Inventory since everything is self explanatory."

[5] DYS Exhibit 3.

4

herself to criticize Smitherman's discretionary authority to appropriate inventory, equipment, budget items and other resources to various DYS schools.

For example, Smitherman routinely left Carr's assignments on her desk with a post-it note providing instructions. On March 23, 2006, Smitherman left a stack of papers on Carr's desk with instructions to shred.[6]  Instead of following the instructions, Carr gave stack of papers back to Smitherman, basically telling Smitherman to do it herself.  Carr left a post-it note saying "I need you to shred this because it is teacher info, thanks, Ruby."  The material contained teacher certification information and professional development information which, prior to March 23, Carr routinely shredded. The fact that the material contained teacher information did not prevent Carr from shredding it. During the course of the hearing, Carr gave a long list of excuses why– in her "opinion"– she should not have been required to shred the information, however, the more Carr adamantly contended she should not have to shred the information, the more she proved by her attitude and defiance that she, in fact, was insubordinate, uncooperative and arrogant toward her superiors. Her defiance illustrated more of her motive to manipulate and control Smitherman, rather than presenting a substantive defense to the charges or the ability to work cohesively with her supervisor.   Throughout the hearing it became clear that Carr intended to write her own job description and perform duties she selected for herself rather than those assigned to her.  When Smitherman interfered with Carr's agenda, Carr created some artificial reason to

---

[6] The documents had to be shredded because it contained private information and these were extra copies. DYS could not throw them away without shredding.

5

lash out at Smitherman. The specifics of Carr's conduct are set forth herein.

Unfortunately the March 23, 2006 confrontation and the January 23 refusal of property inventory duties were not isolated events, but rather the beginning of a series of defiant and insubordinate behavior.

The next incident occurred when Smitherman traveled out of town on DYS business. While Smitherman was away, Carr had been given some paperwork to file. One of the papers documented that a laptop computer had been provided to one of the ASA I employees who traveled to various schools as part of her job duties. Even though property inventory was no longer part of her job description, and she was responsible only for filing the document, Carr took it upon herself to contact another ASA in another school district to discuss that if one of the ASA's had been given a laptop, why shouldn't all ASA's within DYS be given laptops (regardless of job responsibilities).

When Smitherman returned, Carr left a memorandum complaining about not also receiving a Gateway laptop computer.[7] At the hearing, Carr claimed to be enraged that some districts received the laptops while others did not. Carr particularly complained that she had not been assigned a laptop.[8] Carr does not

---

[7] Ironically, Carr had been offered a laptop computer. (Smitherman testimony) Also, Carr's January 23 memorandum admits that Carr returned two Gateway Laptop computers to Smitherman when she relinquished her property inventory duties. (DYS Ex. 3).

[8] DYS Ex. 4. Carr wrote in an argumentative memorandum addressed to her supervisor, Smitherman, dated March 23, 2006. The memo is particularly demanding and hostile. The memorandum appears to direct her supervisor how to handle property inventory, even though, property inventory assignments are no longer a part of Carr's job duties. Even without knowledge of all the facts, Carr practically reprimands her supervisor and demands a laptop computer, not because her job duties require one, but simply because an ASA I in another School District received one. The memorandum states in pertinent part:

" .... Per phone conversation with you on 3/23/2006 in reference to the Gateway Laptop Computer you issue to Joniece Hamilton-Wood, ASA I for Chalkville-Sequoyah school on February 2, 2006. I spoke briefly with Ms.

6

dispute that her job duties permitted to her perform all work in the office and that her duties did not entail work outside the office. Carr presented absolutely no justification that her duties required a laptop computer. Carr simply wanted a laptop because DYS assigned a laptop to another employee. Smitherman explained that Carr and the ASA to whom the laptop had been assigned, were not similarly situated employees. The other ASA's job description required travel and presentations outside the office, necessitating a portable computer. At the hearing, Smitherman pointed out that DYS assigned Carr one of the office's newest desktop computers, with a 19 inch display screen. In fact, Carr's computer exceeded the quality of Smitherman's. Smitherman testified that she previously offered Carr a laptop when an extra one became available, but Carr refused it. When confronted with this fact, Carr stated she turned down the Gateway laptop because she wanted a Dell and because she felt all ASA's should have laptops. No evidence suggested any ASA was assigned a Dell laptop. Since Carr's March 23 memorandum regarding the laptop and other property items concerning the apportionment of inventory (a duty which Carr refused to perform and

---

Yolanda Kelley, Technology Coordinator concerning the issuance of the Laptop Computer, but Ms. Kelly informed me that she did not know anything about this."

"Please help me to understand why Mrs. Wood was issued a Gateway Laptop Computer and no other individual serving as a Secretary for School District 210 was offered or received one. As your personal secretary, you often say, I was not offered nor issued a Gateway Laptop Computer."

"In July, 2005 I ask you would the Secretaries receive a Gateway Laptop Computer and you informed me that only the teachers were to receive a Laptop...:

"I feel that all individuals serving as a Secretary for School District 210 should have been offered or received a new Gateway Laptop Computer on February 2, 2006. As I informed you I would prefer a Dell Laptop over a Gateway. ..."

7

relinquished in January), Smitherman informed Carr, that they were not at liberty to discuss property inventory assignments with her, since she relinquished these duties months earlier.[9]  Moreover, Smitherman was forced to counsel Carr for discussing property inventory assignments outside the office, conduct which violated DYS policy.   Smitherman also counseled Carr that if she had questions, she must follow the chain of command, and not circumvent her supervisors by calling other ASA's and discussing the documents given to her simply for filing. Naturally, Carr's unnecessary creation of an issue about equipment distribution among unrelated ASA's, could likely disrupt the work place and create animosity. Smitherman's memos demonstrate that she handled the matter with professionalism, kindness and tact.   Smitherman again inquired Carr's reasons for wanting a laptop to determine if additional facts existed which required this

---

[9] DYS Ex. 5. Smitherman recorded her instructions in a memorandum dated 3/31/06. It states in pertinent part:

"... Unfortunately, I am unable to discuss with you the circumstances regarding equipment issued to other employees in circumstances different from yours. Nor would I discuss with others your circumstances. Such discussion is unprofessional and not accepted. Please acknowledge that each individual employed by [DYS] and DYS School District has their own individual responsibilities based on their location and job duties. Few, if any two individuals have the same exactly, and that is why each individual has a written performance appraisal based on that specific individual's job responsibilities.

In response to property inventory, as per your memo 1/12/06 re: property inventory DYS School District 210 and Memo 3/23/06 re: gateway laptop computer, you no longer maintain inventory documentation and you have not since January 2006. So any communication on your part as to property inventory was out of your job responsibility. You were asked to file such documents, not disseminate information for which you are not responsible.

As to your concern about lack of communication, many items that fall under the responsibility of our offices contain private and personal information and should be treated as such. Therefore, many items that I deal with on a daily basis are considered private/confidential and can not be shared....

The information on which your letter was based came to you as a result of reading the documents I asked you to file, some of which were confidential. Your reading those documents is a violation of ethics, I cannot tolerate that from someone in your position. I continue to feel you are talented and I am happy to work with someone with your skills but such violations (sic) will not be tolerated. As your supervisor, I expect communication to follow the chain of command and to remain with the responsibilities of your position...."

8

equipment for the performance of Carr's duties.[10]    At the hearing, Carr provided

no satisfactory explanation why her job duties necessitated a laptop in March,

2006.  Rather, Carr only wanted what she saw others receiving, regardless of

necessity.  In fact, Carr admitted Smitherman offered her a laptop in April, yet

Carr refused the laptop again.  Smitherman, as a supervisor, appropriately

counseled Carr.  Rather than respond in a manner of respect and an attempt to

improve her conduct, Carr responded with anger, unsubstantiated criticism and a

refusal to accept any further work assignments.

In what appears nothing more than an obstreperous attempt to harass

Smitherman, Carr drafted a "Letter of Grievance" against Smitherman which

included a laundry list of complaints such as:

- Untimely complaints about  matters occurring as far back as 2004, which
had either been resolved, occurred under supervisors other than
Smitherman, or concerned petty office matters (such as one employee
receiving a new phone instead of Carr);

- Unsupported accusations of retaliation and discrimination without facts or
substance;

- Carr's personal opinion on DYS matters outside the scope of her duties;

- Complaints expressing resentment for not being allowed to perform her own

---

[10] The majority of the evidence demonstrates Carr performed all her duties at her work station, inside the office.  Carr did not travel as part of her regular assignments.

9

agenda rather than follow Smitherman's instructions.[11]

When submitting this alleged "grievance," Carr did not follow well established DYS grievance procedures,[12] and carbon copied unrelated DYS employees, specifically, Debra Spann, Tim Davis, Marcia Calendar and J. Walter Wood. The alleged grievance appears to be a transparent attempt by Carr to embarrass Smitherman rather than seek to earnestly resolve any particular issue.

---

[11] DYS Ex. 6. Carr's "Letter of Grievance" dated April 7, 2006 stated:

Ms. Smitherman, I am receipt of your memorandum dated March 31, 2006 ... based upon .... your allegation of my violation of ethics, I submit to you this Letter of Grievance. ... I would like to meet with you on Monday, April 10, 2006, to discuss the following concerns of unfair treatment of staff, lack of communication and your allegation of my violation of ethics. I feel that I have been unfairly treated and have tolerated and witnessed a lot of unfair situations and circumstances here... since September 22, 2004.

* I tolerated for several months working in the storage room with (60+ ) boxes surrounding the table not a desk that I use.[sic].
* I tolerated being told by you "blatantly and racially" that I could not help Mrs. Queen Barker with SSTI/SETS on August 23, 2005.
* I tolerated being denied training for STI at L. B. Wallace School on August 24, [sic] & 25, 2005
* I tolerated your giving the new Technology Coordinator, Mrs. Yolanda Kelley, a brand new telephone for her office, and you told me that I would not be getting a new phone.
* I tolerate not having access to Outlook Express because you informed me that it cost to much for me to have that email account but everyone else have [sic] access to Outlook Express.
* I tolerate Mrs. [S. T.]., ASA III having a new telephone with Caller ID, Speaker Phone and Conference Call, etc.
* I tolerated being asked by you to do Mrs. Shelia Turner, ASA III work (2/15/06) while Ms. Turner watch [sic] a movie on her DVD at her desk. You exited the building for a meeting.
* I tolerated Mrs. [S. T.] slamming my office door on Wednesday, April 5, 2006, because I was willing to assist Dr. SoJuan Crenshaw with information concerning a telephone and file cabinet.
* I tolerate doing the Federal Programs and Curriculum Coordinator work and not receiving more benefits or pay.
* I tolerate watching you blatantly and racially discriminate against other individuals DYS School District 210.
* I resent the office confusion that often occurs because I am willing to assist and communicate with other employees.
* I resent not being offered or issued a Gateway Laptop Computer on February 2, 2006.
* I resent being retaliated against, unfairly treated and alleged of violation of ethics [sic] because I made you aware that it was unfair for a Secretary to be issued a Gateway Laptop and no other individual serving as a Secretary for DYS School District 210 was offered or issued one.
* I resent being accused of a violation of ethics: In order for me to file the document, I had to look and read to see where the file that particular document. I do not feel that I have violated any ethics concerning the inventory Property Form.

According to you in July 2005, I was informed that only the teachers would receive the Gateway Laptop Computer due to Federal Funds that was allotted [sic] specifically in the grant for teachers. ...

[12] DYS Grievance Procedure Policy 3.13.1

10

Smitherman met with Carr as soon as practicable on April 13, 2006, to discuss Carr's concerns. Smitherman told Carr that the meeting was being recorded. Moreover, and the recorder was open and obvious on Smitherman's desk. The audio taped record of the conversation demonstrates that while Smitherman attempts to discuss each allegation with calmness and sincerity, Carr's tone of voice continues to rise throughout the conference until she clearly becomes angry and hostile.[13] Similar behavior was demonstrated by both Smitherman and Carr at the hearing. Smitherman spoke calmly whereas Carr was more defiant and demonstrated she made no realistic attempt to try and resolve her issues with Smitherman.

Smitherman attempted to address each of Carr's accusations.[14] Smitherman explained that when determining the assignment of equipment such as telephones and computers and software, DYS takes into consideration an employee's job duties. Naturally, DYS gives priority to those employees whose job duties necessitate certain resources to perform their assigned tasks. Smitherman explained that Carr improperly contacted unrelated employees about the assignment of various DYS equipment. Smitherman also explained that when information regarding the appropriation of resources is distributed outside necessary channels, it disrupts the work environment. Thus, Carr acted outside the scope of her duties when contacting other ASA's to see if they had been assigned

---

[13] DYS Ex. 7.

[14] Smitherman testimony.

11

laptop computers.

Additionally, Smitherman explained that even though she had previously cautioned Carr about maintaining confidentiality of the records which came across her desk and following DYS policy instructions (such as grievance procedures), Carr nevertheless, copied this "grievance" to unnecessary employees outside the chain set forth in DYS policy. Smitherman explained that normally grievances are submitted initially only to the direct supervisor, giving the employee and the supervisor an opportunity to resolve the issue. Instead, Carr also sent it to the director, deputy director and others.[15]   Throughout the conference, Smitherman testified that Carr pointed her finger and shook her fist at Smitherman. Carr also makes ridiculous demands such as more holidays and more time off of work.

Smitherman discussed each of the claims in detail. First, Carr complained that in 2004 she initially worked in an area where some boxes had to be stored, Smitherman testified that Carr's temporary work station at a table in that area has long since been resolved. More importantly, DYS Grievance Procedure mandates that "within five days of the event, the aggrieved employee should discuss the matter with his immediate supervisor." Clearly events taking place more than two years ago were time barred. Additionally, Smitherman did not supervise Carr at

---

[15] The DYS grievance procedure is contained in DYS Ex. 8.  The memorandum prepared by Smitherman in DYS Ex. 8 explains that the majority of the complaints are not grievable because they are either time barred per DYS Policy 3.13.1 or because they did not involve incidents between Carr and Smitherman. With regard to Carr's complaint about not receiving more pay for her work with Federal Programs, Smitherman explained that this work is, and has always been part of Carr's job description. Carr's Pre-Appraisal specifically states that Carr's responsibilities include assisting with writing, completing forms and reports, calculating data, interacting with individuals, reading files, typing written and electronic communications, documentation and other paperwork according to oral and written instructions and DYS policy.  Smitherman provided detailed responses and counseling on every issue.

12

the time.

Smitherman adamantly and convincingly denied any discriminatory motive. Nearly all of Carr's complaints were made long after the five day period expired, (some even years later) or did not involve Smitherman's supervision. Thus, the vast majority of complaints failed to qualify as a "grievance" pursuant to DYS policy. Nevertheless, even had Carr timely submitted the charges, the allegations failed to state any substantive claim or present a valid complaint against Smitherman.

Smitherman explained that Carr could not realistically fully perform her own duties and that of another employee. Thus, Smitherman instructed Carr to perform the assignments made to her, before volunteering to assist other employees, such as Queen Barker who worked on STI statistics.[16]

Shockingly, Carr responded that Smitherman had no right to tell her not to help another employee even though the facts undisputedly demonstrate that Smitherman supervised Carr, was charged with the responsibility for making Carr's assignments and conducting Carr's Annual Performance Appraisal.

With regard to Carr's desire for Outlook Express, the weight of the evidence demonstrated that Carr was able to perform her job with another email program and did not require Outlook Express. The evidence fails to demonstrate that other similarly situated employees with Carr's identical job duties working with

---

[16] STI is a computer data base which manages the student's information. STITD is a data base which manages the teachers' professional development. These tracking databases record various statistical information. Carr had no responsibilities with managing the students' information other than simple numbers like populations.

13

Smitherman were awarded equipment based upon some discriminatory motive. Carr failed to establish any other similarly situated employee treated differently.

With respect to another employee, S.T., receiving a new phone and allegedly slamming the door to Carr's office, Smitherman explained that S.T. often slams doors around the office because she has cerebral palsy which handicaps one side of her body. S.T. usually walks with either a cane or walker. However, S.T. valiantly strives to completely take care of herself, and often refuses to park in the handicapped spot because she does not want people to feel sorry for her. Often S.T. cannot shut a door without slamming it and leans up against the wall when traveling down the hallway. No evidence demonstrated that Smitherman had knowledge or notice of a specific time when S.T. may have slammed Carr's office door. However, the weight of the evidence suggests that if S.T. did slam Carr's door, it was an unintended result of a handicap and not any form of racial or hostile harassment. Queen Barker, a friend and co-worker of Carr's, admitted to hearing Carr yelling at S.T. one day. Barker recalled a door slamming, however this alone does not establish that Carr was being harassed by anyone. Further, with regard to the phone assignment, the evidence demonstrated that S.T.'s assignment of a new phone was based upon need and job duty assignments, not any animosity or discriminatory motive toward Carr.

With regard to training, Carr complained of a need for secretarial and bookkeeping training, however Smitherman could not recall when Carr requested training necessary for the performance of Carr's duties which had been denied.

14

Smitherman explained that Carr performed a clerical job, thus detailed technical training for specialized software for STI fell far outside Carr's job description. Carr admitted to Smitherman that she was given the opportunity to go to a Microsoft Word workshop, yet Carr remained at home sick the day the training was offered.

With regard to Carr's complaint that she was asked to perform an ASA's work while the ASA watched a movie, the weight of the evidence demonstrated Smitherman had no knowledge or notice that the ASA watched a movie. In fact, Carr admitted Smitherman left the building during that time. When Smitherman returned, the evidence demonstrates Carr did not inform Smitherman about the movie until she submitted the untimely "grievance" at issue. Smitherman had no recollection of asking Carr to type anything for this particular ASA and Carr's credibility on the subject remains questionable.

Further, with regard to Carr's claim that she performed duties concerning the Federal programs and curriculum coordinator yet received no additional pay or benefits, Carr failed to explain how or why these particular duties enhanced her job performance. The weight of the evidence demonstrated responsibility for these Federal Programs were encompassed within her DYS duties initially explained to her.

Further, Carr claims that Smitherman made inventory assignments in a manner which Carr perceived to be discriminatory. Carr does not possess standing to raise issues involving third parties. Further, assignments of inventory were

15

duties relinquished by Carr, thus the undisputed evidence demonstrates that Carr was complaining about matters outside her job duties, and to which she did not possess all the necessary factual information regarding these assignments. Thus, her complaints, uninformed opinion and commentary provide no basis for a personal grievance.

Following Smitherman's April 13, 2006 meeting with Carr, Smitherman sent Carr a memorandum dated April 19, 2006, responding to her complaints.[17]

Next, on or around April 17, 2006, Smitherman sent Carr an email letting Carr know that Smitherman would be out of the office and provided contact information, as well as instructions to go through some material and throw away certain information. Carr responded in an email on or around April 26, explaining that Carr was out of the office from April 17- 21, 2006 due to a death in her family and providing excuses why she could not complete Smitherman's assignments.[18]

Next, as a result of Carr's refusal to perform assignments, yelling at her supervisor, insubordination and disruptive behavior, Carr was given a reprimand on April 27, 2006, which Carr refused to sign.[19] Carr was informed that she could resolve the situation by completing all directives assigned to her by Smitherman and refrain from belligerent, aggressive, loud or insubordinate conduct. Still

---

[17] DYS Ex. 8.

[18] DYS Ex. 9; Carr testimony; Smitherman testimony. Carr tried to use as a basis for refusing to perform the assignment that because Smitherman had told Carr that she violated ethical policies concerning confidentiality of inventory records, Carr was refusing to shred documentation involving social security numbers. Carr also did not want to perform any assigned task until her grievance was fully resolved. At the time Carr responded, Smitherman had fully responded to Carr's concerns.

[19] DYS Ex. 10.

16

Carr's behavior did not improve.  On May, 1, 2006, Smitherman issued another reprimand to Carr for two instances of insubordination.  On April 27, 2006, when Smitherman requested to meet with Carr formally, Carr refused.  Again, that same day, Carr refused to complete assignments given to her by Smitherman. Smitherman instructed Carr again to refrain from inappropriate conduct. Carr refused to sign this written reprimand, as well.

On May 5th and 9th of 2006, Carr filed letters with the Director John Stewart about Smitherman.  On May 10th, Carr also filed with Smitherman an "Addendum to her Grievance" adamantly refusing to perform Smitherman's directives and accusing Smitherman of harassment by making assignments.[20]

The evidence demonstrated Carr was loud and disruptive in the work place.[21]  Dr. John Stewart, whose office is located close to Carr and Smitherman, testified at an administrative hearing on May 16, 2006 that he heard Carr yelling at Smitherman while in Smitherman's office. Yet Stewart did not hear Smitherman raise her voice.[22]  Stewart also witnessed Carr refusing to meet with Smitherman and saying loudly and abruptly, "No, I'm not going to [meet with Smitherman]" and walking out of Smitherman's office on May 1.[23]

Throughout April and May, Carr refused to perform even the most mundane

---

[20] DYS Ex. 14 & 15.

[21] DYS Ex. 16.

[22]  DYS Ex. 16, transcript pp. 244 - 246.

[23]  DYS Ex. 16, transcript pp. 246 - 266.

assignments such as drafting letters. For instance, Smitherman asked Carr to draft a standard memorandum, which had been done before, on April 21 regarding various staff awards. These federal funds were specifically designated for technology and the recipients had to comply with certain federal funding requirements. Carr had drafted the previous years' letters, but this time, Carr sent the assignment back and told Smitherman to write it herself. Carr wanted Smitherman to draft the exact words that Smitherman wanted in the letter and only then would Carr type it. Generally, these standard form type letters for federal funding grants and awards are done every year. The evidence demonstrated no legitimate reason why Carr could not perform this task. In another instance, since Carr had developed dividers for Dr. Stewart's policy manual, Smitherman asked Carr to provide the same dividers for Smitherman's policy manual. This was the only assignment Smitherman made that day. Nevertheless, Carr only responded something to the effect, "why have I got to do it today, why do I have to do it." Carr was packing up Easter eggs and office decorations at the time and had no other assignments.

Ultimately, Carr completely refused to talk or meet with Smitherman, and instead told her supervisor that if Smitherman had anything to say, just to put it in Carr's mailbox.

Finally, since Carr and Smitherman had reached an impasse, Smitherman had no other choice but to recommend Carr's termination.

18

## THE EMPLOYEE'S PERSONNEL FILE

The Employee's personnel file demonstrates the following Annual

Performance Appraisal Scores out of a possible 40:

| Dates | Responsibility | Disciplinary | Total | Category |
|---|---|---|---|---|
| 9/2004-9/2005 | 38.3 | 0 | 38.3 | Exceeds Standards |
| 9/2003-9/2004 | 26 | 7[24] | 19 | Meets Standards |
| 9/2002-9/2003 | 30 | 0 | 30 | Exceeds Standards |
| 9/2001-9/2002 | 30 | 0 | 30 | Exceeds Standards |
| 9/2000-2/2001 | 30 | 0 | 30 | Exceeds Standards |
| 5/2000-11/2000 | 29 | 0 | 29 | Exceeds Standards |
| 6/1999 to 12/1999 | 27.5 | 0 | 27.5 | Exceeds Standards |

## III. ISSUE

Did the Department produce sufficient evidence to warrant dismissal of the

Employee for violations of DMH policy for failure to perform her job properly,

insubordination and disruptive conduct?

## IV. DISCUSSION

### Standard of Review

The purpose of the Administrative Appeal is to determine if the termination

of the Employee is warranted and supported by the evidence. *Kucera v. Ballard,*

---

[24] Employee's appraisal notes noncompliance in the "Compliance with Rules" category. The appraisal documents a reprimand for failing to obtain approval for two days in which she failed to report for work, even though her supervisor verbally told her that he could not approve the time off. The Employee refused to sign the evaluation. In a written memorandum dated July 13, 2004, Phyllis L. Rankins, Carr's supervisor wrote that Carr expressed "her displeasure" about her new work schedule to another supervisor, Mr. Smith. When Smith informed Carr that he could not approve leave requested by Carr, she "became irate" stating that she was not prepared to work and would be returning home. Rankins reprimanded Carr for failure to follow DYS policy.

19

485 So. 2d 345 (Ala. Civ. App. 1986); *Thompson v. Alabama Dept. of Mental Health*, 477 So. 2d 427 (Ala. Civ. App. 1985); *Roberson v. Personnel Bd. of the State of Alabama*, 390 So. 2d 658 (Ala. Civ. App. 1980). Recently in *Earl v. State Personnel Board*, slip op, 2030508 (March 14, 2006) the Alabama Court of Civil Appeals reiterated:

> "[D]ismissal by an appointing authority ... is reviewable by the personnel board only to determine if the reasons stated for the dismissal are sustained by the evidence presented at the hearing."

Slip op. at p. 27, quoting *Johnston v. State Personnel Bd.*, 447 So. 2d 752, 755 (Ala. Civ. App. 1983).[25]

In determining whether an employee's dismissal is warranted, the departmental agency bears the burden of proving the charges warrant termination by a "preponderance of the evidence." The law is well settled that a "preponderance of the evidence" standard requires a showing of a *probability* that the Employee is guilty of the acts as charged. Thus, there must be more than a mere possibility or one possibility among others that the facts support the disciplinary action at issue, the evidence must establish that *more probably than not*, the Employee performed, or failed to properly perform, as charged. *See Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (1997), holding that a "significant possibility" falls far short of the APA's preponderance of the evidence standard; *See also Wright v. State of Tex.*, 533

---

[25] The Alabama Court of Civil Appeals went further to hold: "both this court and the circuit court must take the administrative agency's order as 'prima facie just and reasonable' and neither this court nor the circuit court may 'substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Slip op at 27, citing Ala., Code 1975, § 41-22-20 (k); *State Dept. Of Human Res. v. Gilbert*, 681 So. 2d 560, 562 (Ala. Civ. App. 1995).

20

F.2d 185 (5th Cir. 1976)[26]

**The Department Proved Evidentiary Facts Warranting Termination**

In the present case, the Department substantiated that Carr began refusing assignments and responsibilities from January through May of 2006. Thus, Carr clearly failed to perform her job properly. Next, by yelling at her supervisor, sending baseless critical memorandums to unrelated parties, attempting to create issues among about the distribution of inventory and the other disruptive and insubordinate conduct detailed herein, the Department demonstrated by the great weight of the evidence, facts justifying termination. Despite repeated instructions, Carr's behavior was not only disruptive and insubordinate, but openly hostile, aggressively and harassing toward her supervisor.

Accordingly, the undersigned finds the totality of the evidence warrants termination in this cause. Therefore, the undersigned recommends to the State Personnel Board that the dismissal be UPHELD.

Done, this the 14th day of December, 2006.

JULIA JORDAN WELLER
Administrative Law Judge
State of Alabama
Personnel Department
64 North Union Street
Montgomery, Alabama 36130
(334) 242-3451
(334) 353-4481

[26]*Bonner v. City of Pritchard,* 661 F.2d 1206, 1209 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

21

**VIA FACSIMILE AND UNITED STATES MAIL**

Jason Manasco, Esq. - **Attorney for Ruby Carr**
Alabama State Employees Association
110 North Jackson Street
Montgomery, AL  36104
FAX:  832-1074

T.  Dudley Perry, Jr.- **Attorney for DYS**
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax (334) 215-3872

22