**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **RUBY CARR,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 2:07cv532-MHT** |
| | ) | |
| **STATE OF ALABAMA DEPARTMENT OF YOUTH SERVICES; J. WALTER WOOD, Jr., INDIVIDUALLY AND AS EXECUTIVE DIRECTOR OF THE ALABAMA DEPARTMENT OF YOUTH SERVICES; TROY KING AS ATTORNEY GENERAL OF THE STATE OF ALABAMA; T. DUDLEY PERRY JR., INDIVIDUALLY AND IN HIS CAPACITY AS, DEPUTY ATTORNEY GENERAL; AND TRACY SMITHERMAN, INDIVIDUALLY** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## MOTION TO DISMISS

**COME NOW** the Defendants, pursuant to Rule 12 (b) of the Federal Rules of Civil Procedure, and request that this Honorable Court dismiss all claims against them with prejudice. As grounds, and without waiving any other position that might be asserted at a later time, the Defendants state the following:

## UNDISPUTED MATERIAL FACTS AND PROCEDURAL HISTORY

1. On or about June 1999, the Plaintiff was hired as an Administrative Support Assistant I for the Alabama Department of Youth Services ("DYS").

2. On May 16, 2006, DYS held a pre-disciplinary conference to discuss certain allegations that the Plaintiff had failed to perform her job properly, that the

Plaintiff had been disruptive, and that the Plaintiff had been insubordinate.

3.      On June 23, 2006, J. Walter Wood, Jr. ("Wood") issued a letter to the Plaintiff advising her of her termination effective June 23, 2006.  The grounds for the termination as set forth in that letter were that the employee had violated Rules of the State Personnel Board concerning the failure to perform her job properly, disruptive conduct, and insubordination.

4.      On June 30, 2006, the Plaintiff filed her appeal to the Alabama State Personnel Board.

5.      On July 25, 2006, the Personnel Board held a pre-hearing conference. At that pre-hearing conference, the Plaintiff's appeal hearing was set for September 19, 2006.

6.      Following this hearing, wherein the Plaintiff and DYS were allowed to present testimony and evidence, Administrative Law Judge Julia Jordan Weller ("ALJ") found that the Department proved evidentiary facts warranting the Plaintiff's termination and recommended to the State Personnel Board that the Plaintiff's termination be upheld. (Exh. 1).

7.       Specifically, the ALJ found, as evidenced by her Order dated December 14, 2006, that DYS substantiated that the Plaintiff began refusing assignments and responsibilities from January through May of 2006, thus failing to perform her job properly.  (Exh. 1, p. 21).

8.      Next, the ALJ found, as evidenced by her Order dated December 14, 2006, that DYS substantiated that the Plaintiff by, *inter alia,* yelling at her supervisor, sending baseless critical memorandums to unrelated parties, and attempting to create issues about

the distribution of inventory, was in fact disruptive and insubordinate. (Exh. 1, p. 21).

9.     The ALJ concluded by stating that despite repeated instructions, the Plaintiff's behavior was not only disruptive and insubordinate, but openly hostile, aggressive, and harassing toward her supervisor. (Exh. 1, p. 21).

10.     Prior to the issuance of the ALJ's Order, the Plaintiff, on December 8, 2006, filed a Charge of Discrimination with the EEOC, alleging retaliation. (Exh. 2).

11.     On or about June 15, 2007, the Plaintiff filed her initial Complaint against the Alabama Department of Youth Services.

12.     On or about December 19, 2007, the Plaintiff filed an Amended Complaint adding the following defendants: Wood, individually and in his official capacity; Troy King ("King") in his official capacity; T. Dudley Perry, Jr.("Perry"), individually and in his official capacity; and Tracy Smitherman ("Smitherman"), individually.

13.     The Plaintiff is an adult who was previously employed by the Alabama Department of Youth Services from June 1999 until June 23, 2006.

14.     The Plaintiff attempts to assert claims of retaliation under Title VII of the Civil Rights Act of 1964, as amended; of discrimination "on the basis of race" under 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983"); and for state law violations for breach of contract.

15.     With respect to Defendant Attorney General Troy King, the Plaintiff is completely silent as to any alleged conduct that he engaged in that would be violative of her rights. In fact, King is mentioned only twice in the Complaint. King is mentioned once, in the style of the Complaint, and then again on page two (2) of the Complaint,

wherein the Plaintiff merely states that he is the Attorney General of the State of Alabama. The Plaintiff does not mention King's name in any prayer for relief found in the Complaint.

## ARGUMENT

### I.    INTRODUCTION

The Plaintiff filed a lawsuit against four (4) named individual Defendants and DYS. It appears from the Complaint that Wood and Perry are sued in their individual and official capacities; that King is sued solely in his official capacity; and that Smitherman is sued solely in her individual capacity

The Plaintiff's claims under Section 1981 must fail because they are plainly not actionable. Section 1983 provides the exclusive federal damages remedy for violations of rights declared in Section 1981 when the claim is against state actors. Here all of the alleged actors are state actors, who were acting in the line and scope of their duties, in terminating an ineffective, insubordinate employee.

All of the Plaintiff's claims against DYS are due to be dismissed because they are completely barred by Eleventh Amendment immunity due to the fact that DYS is a state agency. Furthermore, state officials sued in their official capacities partake of the state's Eleventh Amendment immunity. Therefore, all monetary claims against the named individual Defendants in their official capacity are also due to be dismissed.

The Defendants do not concede that the Plaintiff has properly named and asserted claims against them in their individual capacities. Yet and still, any individual capacity claims against the named individual Defendants are due to be dismissed on the basis of qualified immunity. Furthermore, the Plaintiff has not met her burden of establishing that

the named Defendants alleged actions violated clearly established statutory or constitutional rights.

The Plaintiff's Title VII claims are due to be dismissed against Wood because he was not the Plaintiff's employer. Likewise the Plaintiff's Title VII claims against DYS are also due to be dismissed because the Plaintiff cannot pass the *prima facie* test that her termination was in retaliation for her engaging in Title protected activity.

Lastly, the Complaint is due to be dismissed in its entirety because not only does it fail to meet the "heightened pleading requirement" for Section 1983 claims, it fails to meet the basic pleading requirements of Rule 8, Fed. R. Civ. P.

Based on the foregoing, the Plaintiffs' lawsuit is due to be dismissed in its entirety at this juncture.

## II. PLAINTIFF'S CLAIMS AGAINST DYS ARE BARRED BY ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment is a complete bar to lawsuits against a state or state agency regardless of the nature of the relief sought. *See e.g., Edelman v. Jordan*, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 1355, 39 L. Ed. 2d 662 (1974)(monetary relief); *Alabama v. Pugh*, 438 U.S. 781, 782 98 S. Ct. 3057, 3058 (1978) (injunctive relief). Under Alabama law, DYS is an agency of the State of Alabama.1 *See* Ala. Code § 44-1-20 (1975) (statute creating the State of Alabama Department of Youth Services). Therefore, as a state agency, DYS is immune from suit for monetary relief and also suits for injunctive relief. *Jones v. Phyfer*, 761 F.2d 642, 643 (11th Cir. 1985)(stating DYS was a state agency entitled to 11th Amendment immunity).

Accordingly, the Plaintiffs' Section 1981, and Section 1983 claims against DYS

---

1 The Plaintiff concedes this point in her complaint on page two (2) at paragraph five (5).

are completely barred by the Eleventh Amendment to the United States Constitution regardless of the relief sought. *See E.g., Carr v. City of Florence*, 916 F.2d 1521, 1524-25 (11th Cir. 1990)(Section 1983); *Sessions v. Rusk State Hosp*., 648 F.2d 1066, 1069 (5th Cir. 1981)(Section 1981).

Based on the foregoing, all of Plaintiffs' claims against DYS are due to be dismissed because this Court lacks subject matter jurisdiction over these claims.

## III. PLAINTIFFS' CLAIMS AGAINST INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY ARE ALSO BARRED BY ELEVENTH AMENDMENT IMMUNITY

All of the claims against the named individual Defendants in their official capacities must fail as a matter of law. "Official capacity suits . . . generally represent only another way of pleading an action against an entity which an officer is an agent . . . . [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); *see also Quern v. Jordan,* 440 U.S. 332, 341 (1979) (holding that the prohibition on suing states under Section 1983 cannot be evaded by naming a state official in their official capacity in an action for monetary relief).

Thus to the extent that the Plaintiff seeks damages or other monetary relief from the named individual Defendants in their official capacities, the Plaintiff's Section 1981 and Section 1983 claims against these individuals are likewise barred by the Eleventh Amendment to the United States Constitution. *E.g., Kentucky v. Graham*, 473 U.S. at 169; *Edelman v. Jordan*, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); *Cross v. State of Alabama*, 49 F.3d 1490, 1503 (11th Cir. 1995).

Accordingly, this Court lacks subject matter jurisdiction over Plaintiff's claims

for damages against the named individual Defendants in their official capacities.

## IV. PLAINTIFF'S SECTION 1981 CLAIMS ARE DUE TO BE DISMISSED BECAUSE SECTION 1983 PROVIDES THE EXCLUSIVE REMEDY FOR CLAIMS AGAINST STATE ACTORS

The United States Supreme Court has ruled that claims for damages under Section 1981 against state and local government units may only be asserted under Section 1983 because Section 1983 "provides the exclusive federal damages remedy for the violations of rights guaranteed by Section 1981 when the claim is pressed against a state actor." *Jett v. Dallas Independent School District*, 491 U.S. 701, 735, 109 S. Ct. 2702, 405 L. Ed. 2d 598 (1989). The rights declared in Section 1981 are enforced against state actors through the remedial provisions of Section 1983 only. *Jett*, 491 U.S. at 734.

Accordingly, Plaintiff's Section 1981 claims are due to be dismissed in their entirety as to all Defendants based on this reason alone.

## V. QUALIFIED IMMUNITY REQUIRES THE DISMISSAL OF THE PLAINTIFF'S INDIVIDUAL CAPACITY CLAIMS UNDER SECTION 1983

Any claims against the named Defendants in their individual capacities are barred or due to be dismissed based on the myriad of reasons discussed below.

The only claim that can arguably be asserted against the individual Defendants in their individual capacity are those brought under Section 1983. However, these claims are also due to be dismissed based on the doctrine of qualified immunity. *See, e.g., Kentucky v. Graham,* 473 U.S. 159, 166, 105 S. Ct. 3099, 3105; *see also Behrens v. Pelletier*, 516 U.S. 279, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996); *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146 (11th Cir. 1994). The issue of whether the individual Defendants, if deemed to have been named in their individual capacities, are entitled to

qualified immunity is ripe for disposition by this Court at this juncture. The United States Supreme Court has stated that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Qualified Immunity is a question of law to be decided by the court prior to trial. It is designed to allow officials who are entitled to qualified immunity to avoid the expense and disruption of going to trial, and it is not merely a defense to liability. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir. 1991). The Supreme Court has also stated that "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991); *see also Siegert v. Gilley*, 500 U.S. 226, 231-33, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1991) (no discovery if immunity question can end case). That stage is now.

The doctrine of qualified immunity was intended to protect government officials from being subjected to suit and the concomitant burden, expense and harassment associated with litigation which would "dampen the ardor of all but the most resolute, or the most irresponsible [public officials] in the unflinching discharge of their duties." *Harlow*, 457 U.S. at 814. In accordance with this clear intent and purpose sanctioned by the highest court of the land, qualified immunity from personal liability is the rule rather than the exception. It is only in the rarest of cases where the shield of immunity is denied or should be denied to public officials. *Harlow*, 457 U.S. at 818; *Lassiter*, 28 F.3d at 1149. The governing law dictates that public officials shall be entitled to qualified immunity in the execution of the performance of duties requiring their discretionary judgment if their conduct does not violate any "clearly established statutory or

constitutional rights of which a reasonable person would have known." *Id.* The Supreme Court has instructed that plaintiffs may not satisfy their burden of proving a violation merely by referring to general rules and to the violation of abstract "rights." *Anderson v. Creighton*, 483 U.S. 631, 635 (1987). The Supreme Court in Anderson went further to define "clearly established" to mean that "the contours of the violated right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Id*. at 640. Then, in *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), the Supreme Court stated that qualified immunity is available to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.*

Therefore, in order for the Plaintiff's Section 1983 claims to survive the Defendant's Motion to Dismiss based on their claim of qualified immunity, the Plaintiff must show that at the time of her termination, it was clearly established that reasonable supervisors and/ or officers of DYS should have understood that it would violate the Plaintiff's rights to terminate her when she:

1. Refused job assignments and responsibilities from January through May of 2006.

2. Yelled at her Supervisor.

3. Sent baseless critical memorandums about her supervisor and DYS to unrelated parties.

4. Attempted to create a disorderly work environment throughout the department by discussing with unrelated personnel the department's distribution and allocation of inventory.

5. Was disruptive, insubordinate, openly hostile, aggressive and harassing toward her supervisor.

The Plaintiff cannot credibly contend that, confronted with the above employee

behavior, any supervisor or employer would be unjustified in terminating the employee. Therefore, the Plaintiff certainly cannot show that it was clearly established in June 2006, that her termination, based on the above behavior, would be in violation of her rights or that her supervisors or officers of DYS would have reasonably believed that her termination would be a violation of her rights. The burden is clearly on the Plaintiff to reinforce the existence of her contended statutory or constitutional right through the presentation of case law that would tend to show that a reasonable person would also have been aware of that right. As it now stands, the Complaint contains nothing but conclusory statements. The conclusory nature of the allegations asserted in the Complaint makes it almost impossible to discuss qualified immunity intelligently. As a result, the Defendants are entitled to qualified immunity and the Plaintiff's claims against them are due to be dismissed.

## VI.    PLAINTIFF'S TITLE VII CLIAMS AGAINST WOOD ARE DUE TO BE DISMISSED

The Plaintiff, in Count One (1) of her Complaint asserts Title VII claims against DYS and Wood. The Plaintiff's Title VII claims are somewhat confusing in that she asserts that Wood, acting in his individual capacity, terminated her in violation of Title VII of the Civil Rights Act. However, in her prayer for relief under this same count, the Plaintiff seeks judgment against Wood as the Executive Director of DYS. In other words, the prayer for relief seeks judgment against Wood in his official capacity for actions allegedly taken in his individual capacity. Despite the contradictory pleading of her Title VII claim, Wood asserts that the Plaintiff's Title VII claims against him should be dismissed regardless of whether the Plaintiff is seeking to proceed against him in his individual capacity or his official capacity.

As stated above, official capacity suits merely represent another way of pleading an action against an entity of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985) (stating that "… [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Because the Plaintiff has already sued DYS under Title VII, the naming of Wood as a Title VII Defendant is superfluous and due to be dismissed.

To the extent the Plaintiff attempts to maintain claims against Wood in his individual capacity under Title VII, these claims must also fail. Wood, in his individual capacity is not the employer of the Plaintiff. Title VII is a federal statute that provides a cause of action to individuals for adverse employment actions and; therefore, these claims may only be brought against those entities meeting the statutory definition of employer. *Malone v. Chambers County Board of Commission*, 875 F. Supp. 773, 793 (M.D. Ala. 1994). Title VII defines "employer" as individuals, governments and governmental agencies engaged in an industry affecting commence who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . . *Id.*

Clearly Wood, in his individual capacity, is not the employer of the Plaintiff. This contention is further supported by the Plaintiff's Complaint, which states that DYS is her employer. As a result, all of the claims against Wood under Title VII are due to be dismissed.

## VII. <u>PLAINTIFF'S TITLE VII CLAIMS AGAINST DYS ARE DUE TO BE DISMISSED</u>

The Plaintiff has brought a claim against DYS for violation of her rights under

Title VII, because of her termination in June of 2006. Generally, in a claim based on discriminatory discharge, a Plaintiff must establish: 1) that they are a member of a protected class; 2) that they were discharged from a position for which they were qualified; and 3) that others outside their class were not so treated or that the Plaintiff was replaced by someone not in her protected class. *Lee v. Russell County Board of Education*, 684 F.2d 769, 773-774 (11th Cir. 1982). To the extent that the Plaintiff's claims are based on discriminatory discharge, her claims must be dismissed because her Complaint is void of any allegation that DYS or its agents treated her differently than others that were not members of her class. Further, the plaintiff does not claim that she was replaced by someone outside of her class. Therefore, to the extent the Plaintiff seeks to hold DYS liable for discriminatory discharge, the claims must fail.

In addition to the general standard for proving a *prima facie* case of discriminatory discharge under Title VII, the Eleventh Circuit recognizes a cause of action for retaliation under Title VII. To establish a *prima facie* case for retaliation under Title VII, the plaintiff must show that she, 1) participated in an activity protected by Title VII; 2) suffered an adverse employment action; and 3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *Gupta v. Florida Board of Regents*, 212 F. 3d 571, 587 (11th Cir. 2000). In the present case, the plaintiff can arguably meet the first two (2) prongs of the *prima facie* test. However, she woefully lacks any allegation or proof that would satisfy the third.

The essence of the Plaintiff's case rests on her allegation that her termination was an act of retaliation because she had previously filed an EEOC charge of discrimination in 2005. This means that the Plaintiff's alleged protected activity, occurred more than a

year prior to her termination. Despite the Plaintiff's assertion that she was retaliated against, her Complaint is woefully lacking as to the factual allegations supporting such a claim. The Plaintiff's Complaint is premised on vague generalized conclusions that do not provide DYS with sufficient notice of what it is required to defend itself against.

The reality of this case is that the Plaintiff has sought to hold her supervisor and DYS hostage to her insubordinate and disruptive workplace demeanor, because of a previous EEOC filing, which was resolved more than a year prior to the termination of the Plaintiff. The evidence of this case, including sworn testimony of the Plaintiff, supports DYS's contention that the Plaintiff was terminated for legitimate, non discriminatory reasons. In a letter dated June 23, 2006, Wood advised the Plaintiff that she was being terminated because of her failure to perform her job properly, her disruptive conduct and insubordination. (Exh. 1, p. 2). Following the issuance of the letter of termination, the Plaintiff was afforded all of her due process rights and she appealed her termination to the Alabama State Personnel Board. *Id.* The Alabama State Personnel Board conducted a formal hearing, through ALJ Julia Jordan Weller ("ALJ"), on September 19, 2006. *Id.* During that hearing, evidence was presented that the Plaintiff, in January of 2006, issued a memorandum to her supervisor stating that she would no longer perform parts of her assigned duties. (Exh. 1, pp. 3-4). Also, on or about March 23, 2006, the Plaintiff's supervisor left papers on the Plaintiffs' desk with instructions to shred the documents. Instead of complying with this simple request, the Plaintiff returned the documents with a note of her own telling the supervisor to essentially do it herself. (Exh. 1, p. 5). The evidence and demeanor of the Plaintiff in presenting her reasons or justification for her proven behavior, lead the hearing officer to

remark that:

> Her [Plaintiff] defiance illustrated more of her motive to manipulate and control Smitherman, rather than presenting a substantive defense to the charges or the ability to work cohesively with her supervisor. Through the hearing it became clear that Carr [Plaintiff] intended to write her own job description and perform duties she selected for herself rather than these assigned to her.

(Exh. 1, p. 5).

It was the finding of the ALJ that DYS demonstrated by the great weight of the evidence, facts justifying termination; and, that despite repeated instructions; the Plaintiff's behavior was not only disruptive and insubordinate, but openly hostile, aggressive and harassing toward her supervisor. (Exh. 1, p. 21).

The filing of this instant lawsuit was just another instance of the Plaintiff's defiance and hostility toward her employer DYS. Clearly, the Plaintiff was terminated because of her own actions of insubordination and disruption of the workplace. The Complaint does not sufficiently allege any facts to support any other determination. Add to that the evidence and findings of the ALJ, and it is evident that if ever there were a case that was ripe for dismissal under Title VII, this is that case. Therefore, DYS requests that this honorable court dismiss all of the Plaintiff's Title VII claims.

## VIII. THE PLAINTIFF'S STATE COURT CLAIM SHOULD BE REMANDED TO STATE COURT FOR RESOLUTION

For the reasons set forth above, all of the Plaintiff's federal claims against the Defendants should be dismissed. The sole remaining state law claim for breach of contract should be dismissed as to each of the individually named defendants because

neither of these Defendants entered into a contract with the Plaintiff. One can only surmise that the inclusion of Wood and Perry in the Plaintiff's prayer for relief under the Breach of Contract Count (Count IV) was by mistake, given that the Plaintiff, herself, states that she entered into the contract at issue with DYS and not Wood nor Perry. (Complaint, p. 10). Therefore, with no federal sustainable federal claims to support continued federal jurisdiction, this sole breach of contract claim against DYS should be dismissed with instruction to file in the State Courts of Alabama.

## CONCLUSION

The Plaintiff's Complaint is due to be dismissed in its entirety for a plethora of reasons. All claims against DYS and the named individual Defendants in their official capacity are barred by Eleventh Amendment immunity. In addition, the individual Defendants are entitled to qualified immunity as to any individual capacity claims. Furthermore, Plaintiffs' Section1981 and 1983 claims are clearly not actionable on their face. Accordingly, all claims against all Defendants are due to be dismissed

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs' Complaint is due to be dismissed in its entirety.

Respectfully Submitted,

    s/H. Lewis Gillis
**FREDERIC A. BOLLING  (BOL 030)**
**ROSYLN CREWS           (CRE 013)**
**H. LEWIS GILLIS          (GIL 011)**

**OF COUNSEL:**
**THOMAS, MEANS, GILLIS & SEAY, P.C.**
3121 Zelda Court
P. O. Drawer 5058
Montgomery, Alabama 36106
(334) 270-1033
(334) 260-9396 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon the following by filing with the CM/ECF and placing a copy of same in the United States mail, properly addressed, postage prepaid this the______day of January, 2008.

Guy D. Chappell III
**GUY D. CHAPPELL III, P.C**.
3100 Independence Drive, Suite 200
Birmingham, Alabama 35209

s/ H. Lewis Gillis________________
**OF COUNSEL**



**BEFORE THE STATE PERSONNEL BOARD**
**IN THE MATTER OF**

| | |
|---|---|
| **RUBY CARR,** | ) |
| **Appellant,** | ) |
| **v.** | ) **06-031-jjw** |
| **ALABAMA DEPARTMENT OF YOUTH SERVICES,** | ) |
| **Appellee.** | ) |

RECEIVED DEC 27 2006 DYS HUMAN RESOURCES

**RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD**

The undersigned conducted a hearing on September 19, 2006, at the offices of State Personnel located in Montgomery, Alabama. Jason L. Manasco, Esq. appeared as counsel on behalf of Ruby Carr (hereinafter "Carr" or "the Employee"). Dudley Perry, Esq. appeared on behalf of the Alabama Department of Youth Services (hereinafter "DYS" or "the Department").

The Department introduced 16 exhibits consecutively numbered as 1-16.[1] The Employee identified five exhibits, however, they were also included within the Department's exhibits, so they were not introduced separately.

The witnesses testifying at the hearing were:

(1) Ruby Carr;

(2) Tracy Smitherman, the Employee's supervisor at DYS;

(3) Queen A. Barker, a special education coordinator for DYS; and

[1] The undersigned redacted from the exhibits, the Employee's social security number to protect the Employee's privacy. The parties have not asked for any other documents to be placed under seal.



COPY

**BEFORE THE STATE PERSONNEL BOARD**
**IN THE MATTER OF**

| | | |
|---|---|---|
| **RUBY CARR,** | ) | |
| **Appellant,** | ) | |
| **v.** | ) | **06-031-jjw** |
| **ALABAMA DEPARTMENT OF YOUTH SERVICES,** | ) | |
| **Appellee.** | ) | |

RECEIVED DEC 27 2006 DYS HUMAN RESOURCES

**RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD**

The undersigned conducted a hearing on September 19, 2006, at the offices of State Personnel located in Montgomery, Alabama. Jason L. Manasco, Esq. appeared as counsel on behalf of Ruby Carr (hereinafter "Carr" or "the Employee"). Dudley Perry, Esq. appeared on behalf of the Alabama Department of Youth Services (hereinafter "DYS" or "the Department").

The Department introduced 16 exhibits consecutively numbered as 1-16.[1] The Employee identified five exhibits, however, they were also included within the Department's exhibits, so they were not introduced separately.

The witnesses testifying at the hearing were:

(1) Ruby Carr;

(2) Tracy Smitherman, the Employee's supervisor at DYS;

(3) Queen A. Barker, a special education coordinator for DYS; and

[1] **The undersigned redacted from the exhibits, the Employee's social security number to protect the Employee's privacy.** The parties have not asked for any other documents to be placed under seal.

(4) Dr. Sojuan Crenshaw, a technical educational coordinator at DYS.

## I. PROCEDURAL HISTORY AND CHARGES

The Department employed Carr as an Administrative Support Assistant I (hereinafter "ASA I") beginning in June of 1999. Thereafter, Carr's position changed from Administrative Support Assistant to Youth Services Aide. Carr remained in that position until her termination in June, 2006.

On May 16, 2006, the Department held a pre-disciplinary conference to discuss the allegations and charges. In a letter dated June 23, 2006, the Executive Director, J. Walter Wood (hereinafter "Wood") advised Carr of her termination effective June 23, 2006. As grounds for the termination, Wood stated the Employee violated Rules of the State Personnel Board concerning the failure to perform her job properly, disruptive conduct and insubordination.

The Employee timely appealed the termination to the Alabama State Personnel Board on or about June 30, 2006.

The undersigned held a pre-hearing conference at the earliest possible date for both parties on July 25, 2006. At the pre-hearing conference the undersigned set the matter for hearing on September 19, 2006, a date agreed upon by both parties.

## II. FACTUAL BACKGROUND

DYS maintains five (5) schools across the state. Tracy Smitherman (hereinafter "Smitherman") plans and coordinates curriculums for DYS students.[2]

---

[2] DYS employed Smitherman beginning in 1997, thus Smitherman has worked for the Department for approximately 9 years.

Smitherman's job description also includes the responsibility to work with the schools which DYS children routinely attend, distribute property and inventory, work with teachers regarding matters such as license renewals and certification, and other related duties.

DYS assigned Carr as an administrative assistant to Smitherman specifically for the purpose of assisting with these duties sometime in 2005. Smitherman supervised Carr for approximately one year prior to Carr's termination. From the onset of Carr's assignment to Smitherman, they discussed Carr's responsibilities and general work requirements. During the course of Smitherman's initial meeting with Carr, Smitherman discussed Carr's future performance and duties such as filling out reports such as federal grant awards and statistics, the use of technology, calculating data, general interaction with various local state and federal entities, Carr's responsibility to read through correspondence and reports, filing and to assist with property inventory. DYS assigned Carr only to Smitherman, however, Carr could be permitted to work with other individuals at Smitherman's discretion if time permitted.[3]

Smitherman testified that at some point, her relationship with Carr began to deteriorate, beginning with Carr's refusal to cooperate regarding assigned tasks. Carr claimed to have too many job assignments and asked to be relieved of some of them. Carr claimed time simply did not permit her to perform all the matters assigned to her. As a result, in January, Carr sent a memorandum to her supervisor

---

[3] Smitherman's testimony and Carr's performance appraisals. Carr disputes that she was assigned to Smitherman yet little evidence corroborates Carr's position.

stating that she did not intend to continue to handle her property inventory assignments any longer.[4] Rather than create an argument with Carr, Smitherman decided to comply with her request and remove property and inventory responsibilities from Carr.[5] Thereafter rather than performing the tasks that Smitherman requested, often Carr took the initiative to help others with their duties instead. Ironically, Carr complained to have too many responsibilities under Smitherman's direction, yet at the same time claimed to have plenty of time to assist other employees with their assignments. Since Carr apparently demonstrated an inability to prioritize Smitherman's assignments, Smitherman instructed Carr that some duties were not her responsibility and directed her to refocus her priorities. While Carr initially complied with this instruction prior to January 23, 2006, Carr apparently resented being given these instructions. Carr did not discuss her resentment with Smitherman prior to January 23, 2006.

However, after January 23, 2006, Carr began to refuse to perform various assignments Smitherman gave her. Additionally, Carr began to take it upon herself to demand equipment or office supplies, regardless of whether these items were necessary for her duties. Also, even though her job description provided absolutely no discretionary authority to appropriate equipment, Carr took it upon

---

[4] DYS Ex. 3. Carr did not write a request to be relieved of a duty, but rather issued a statement that she had decided she would no longer perform the duties related to property and inventory. Carr wrote Smitherman stating in part: "Due to circumstances that are beyond my individual control I feel that it is necessary as of this day, January 23, 2006 that I relinquish any and all responsibility of maintaining the Property Inventory Register for DYS School District 210... I am submitting to you copies of the Property Inventory Register & documentation.... Also, I am removing the (2) Gateway Laptop Computers from my office. I do not feel that it is necessary that we meet to discuss anything concerning DYS School District 210 Property Inventory since everything is self explanatory."

[5] DYS Exhibit 3.

herself to criticize Smitherman's discretionary authority to appropriate inventory, equipment, budget items and other resources to various DYS schools.

For example, Smitherman routinely left Carr's assignments on her desk with a post-it note providing instructions. On March 23, 2006, Smitherman left a stack of papers on Carr's desk with instructions to shred.[6] Instead of following the instructions, Carr gave stack of papers back to Smitherman, basically telling Smitherman to do it herself. Carr left a post-it note saying "I need you to shred this because it is teacher info, thanks, Ruby." The material contained teacher certification information and professional development information which, prior to March 23, Carr routinely shredded. The fact that the material contained teacher information did not prevent Carr from shredding it. During the course of the hearing, Carr gave a long list of excuses why– in her "opinion"– she should not have been required to shred the information, however, the more Carr adamantly contended she should not have to shred the information, the more she proved by her attitude and defiance that she, in fact, was insubordinate, uncooperative and arrogant toward her superiors. Her defiance illustrated more of her motive to manipulate and control Smitherman, rather than presenting a substantive defense to the charges or the ability to work cohesively with her supervisor. Throughout the hearing it became clear that Carr intended to write her own job description and perform duties she selected for herself rather than those assigned to her. When Smitherman interfered with Carr's agenda, Carr created some artificial reason to

[6] The documents had to be shredded because it contained private information and these were extra copies. DYS could not throw them away without shredding.

lash out at Smitherman. The specifics of Carr's conduct are set forth herein.

Unfortunately the March 23, 2006 confrontation and the January 23 refusal of property inventory duties were not isolated events, but rather the beginning of a series of defiant and insubordinate behavior.

The next incident occurred when Smitherman traveled out of town on DYS business. While Smitherman was away, Carr had been given some paperwork to file. One of the papers documented that a laptop computer had been provided to one of the ASA I employees who traveled to various schools as part of her job duties. Even though property inventory was no longer part of her job description, and she was responsible only for filing the document, Carr took it upon herself to contact another ASA in another school district to discuss that if one of the ASA's had been given a laptop, why shouldn't all ASA's within DYS be given laptops (regardless of job responsibilities).

When Smitherman returned, Carr left a memorandum complaining about not also receiving a Gateway laptop computer.[7] At the hearing, Carr claimed to be enraged that some districts received the laptops while others did not. Carr particularly complained that she had not been assigned a laptop.[8] Carr does not

---

[7] Ironically, Carr had been offered a laptop computer. (Smitherman testimony) Also, Carr's January 23 memorandum admits that Carr returned two Gateway Laptop computers to Smitherman when she relinquished her property inventory duties. (DYS Ex. 3).

[8] DYS Ex. 4. Carr wrote in an argumentative memorandum addressed to her supervisor, Smitherman, dated March 23, 2006. The memo is particularly demanding and hostile. The memorandum appears to direct her supervisor how to handle property inventory, even though, property inventory assignments are no longer a part of Carr's job duties. Even without knowledge of all the facts, Carr practically reprimands her supervisor and demands a laptop computer, not because her job duties require one, but simply because an ASA I in another School District received one. The memorandum states in pertinent part:

" .... Per phone conversation with you on 3/23/2006 in reference to the Gateway Laptop Computer you issue to Joniece Hamilton-Wood, ASA I for Chalkville-Sequoyah school on February 2, 2006. I spoke briefly with Ms.

dispute that her job duties permitted to her perform all work in the office and that
her duties did not entail work outside the office. Carr presented absolutely no
justification that her duties required a laptop computer. Carr simply wanted a
laptop because DYS assigned a laptop to another employee. Smitherman
explained that Carr and the ASA to whom the laptop had been assigned, were not
similarly situated employees. The other ASA's job description required travel and
presentations outside the office, necessitating a portable computer. At the
hearing, Smitherman pointed out that DYS assigned Carr one of the office's
newest desktop computers, with a 19 inch display screen. In fact, Carr's computer
exceeded the quality of Smitherman's. Smitherman testified that she previously
offered Carr a laptop when an extra one became available, but Carr refused it.
When confronted with this fact, Carr stated she turned down the Gateway laptop
because she wanted a Dell and because she felt all ASA's should have laptops. No
evidence suggested any ASA was assigned a Dell laptop. Since Carr's March 23
memorandum regarding the laptop and other property items concerning the
apportionment of inventory (a duty which Carr refused to perform and

---

Yolanda Kelley, Technology Coordinator concerning the issuance of the Laptop Computer, but Ms. Kelly informed
me that she did not know anything about this."

"Please help me to understand why Mrs. Wood was issued a Gateway Laptop Computer and no other individual
serving as a Secretary for School District 210 was offered or received one. As your personal secretary, you often
say, I was not offered nor issued a Gateway Laptop Computer."

"In July, 2005 I ask you would the Secretaries receive a Gateway Laptop Computer and you informed me that only
the teachers were to receive a Laptop...:

"I feel that all individuals serving as a Secretary for School District 210 should have been offered or received a new
Gateway Laptop Computer on February 2, 2006. As I informed you I would prefer a Dell Laptop over a Gateway.
..."

relinquished in January), Smitherman informed Carr, that they were not at liberty to discuss property inventory assignments with her, since she relinquished these duties months earlier.[9] Moreover, Smitherman was forced to counsel Carr for discussing property inventory assignments outside the office, conduct which violated DYS policy. Smitherman also counseled Carr that if she had questions, she must follow the chain of command, and not circumvent her supervisors by calling other ASA's and discussing the documents given to her simply for filing. Naturally, Carr's unnecessary creation of an issue about equipment distribution among unrelated ASA's, could likely disrupt the work place and create animosity. Smitherman's memos demonstrate that she handled the matter with professionalism, kindness and tact. Smitherman again inquired Carr's reasons for wanting a laptop to determine if additional facts existed which required this

---

[9] DYS Ex. 5. Smitherman recorded her instructions in a memorandum dated 3/31/06. It states in pertinent part:

"... Unfortunately, I am unable to discuss with you the circumstances regarding equipment issued to other employees in circumstances different from yours. Nor would I discuss with others your circumstances. Such discussion is unprofessional and not accepted. Please acknowledge that each individual employed by [DYS] and DYS School District has their own individual responsibilities based on their location and job duties. Few, if any two individuals have the same exactly, and that is why each individual has a written performance appraisal based on that specific individual's job responsibilities.

In response to property inventory, as per your memo 1/12/06 re: property inventory DYS School District 210 and Memo 3/23/06 re: gateway laptop computer, you no longer maintain inventory documentation and you have not since January 2006. So any communication on your part as to property inventory was out of your job responsibility. You were asked to file such documents, not disseminate information for which you are not responsible.

As to your concern about lack of communication, many items that fall under the responsibility of our offices contain private and personal information and should be treated as such. Therefore, many items that I deal with on a daily basis are considered private/confidential and can not be shared....

The information on which your letter was based came to you as a result of reading the documents I asked you to file, some of which were confidential. Your reading those documents is a violation of ethics, I cannot tolerate that from someone in your position. I continue to feel you are talented and I am happy to work with someone with your skills but such violations (sic) will not be tolerated. As your supervisor, I expect communication to follow the chain of command and to remain with the responsibilities of your position....

equipment for the performance of Carr's duties.[10] At the hearing, Carr provided no satisfactory explanation why her job duties necessitated a laptop in March, 2006. Rather, Carr only wanted what she saw others receiving, regardless of necessity. In fact, Carr admitted Smitherman offered her a laptop in April, yet Carr refused the laptop again. Smitherman, as a supervisor, appropriately counseled Carr. Rather than respond in a manner of respect and an attempt to improve her conduct, Carr responded with anger, unsubstantiated criticism and a refusal to accept any further work assignments.

In what appears nothing more than an obstreperous attempt to harass Smitherman, Carr drafted a "Letter of Grievance" against Smitherman which included a laundry list of complaints such as:

- Untimely complaints about matters occurring as far back as 2004, which had either been resolved, occurred under supervisors other than Smitherman, or concerned petty office matters (such as one employee receiving a new phone instead of Carr);
- Unsupported accusations of retaliation and discrimination without facts or substance;
- Carr's personal opinion on DYS matters outside the scope of her duties;
- Complaints expressing resentment for not being allowed to perform her own

[10] The majority of the evidence demonstrates Carr performed all her duties at her work station, inside the office. Carr did not travel as part of her regular assignments.

agenda rather than follow Smitherman's instructions.[11]

When submitting this alleged "grievance," Carr did not follow well established DYS grievance procedures,[12] and carbon copied unrelated DYS employees, specifically, Debra Spann, Tim Davis, Marcia Calendar and J. Walter Wood. The alleged grievance appears to be a transparent attempt by Carr to embarrass Smitherman rather than seek to earnestly resolve any particular issue.

---

[11] DYS Ex. 6. Carr's "Letter of Grievance" dated April 7, 2006 stated:

Ms. Smitherman, I am receipt of your memorandum dated March 31, 2006 ... based upon .... your allegation of my violation of ethics, I submit to you this Letter of Grievance. ... I would like to meet with you on Monday, April 10, 2006, to discuss the following concerns of unfair treatment of staff, lack of communication and your allegation of my violation of ethics. I feel that I have been unfairly treated and have tolerated and witnessed a lot of unfair situations and circumstances here... since September 22, 2004.

* I tolerated for several months working in the storage room with (60+ ) boxes surrounding the table not a desk that I use.[sic].
* I tolerated being told by you "blatantly and racially" that I could not help Mrs. Queen Barker with SSTI/SETS on August 23, 2005.
* I tolerated being denied training for STI at L. B. Wallace School on August 24, [sic] & 25, 2005
* I tolerated your giving the new Technology Coordinator, Mrs. Yolanda Kelley, a brand new telephone for her office, and you told me that I would not be getting a new phone.
* I tolerate not having access to Outlook Express because you informed me that it cost to much for me to have that email account but everyone else have [sic] access to Outlook Express.
* I tolerate Mrs. [S. T]., ASA III having a new telephone with Caller ID, Speaker Phone and Conference Call, etc.
* I tolerated being asked by you to do Mrs. Shelia Turner, ASA III work (2/15/06) while Ms. Turner watch [sic] a movie on her DVD at her desk. You exited the building for a meeting.
* I tolerated Mrs. [S. T.] slamming my office door on Wednesday, April 5, 2006, because I was willing to assist Dr. SoJuan Crenshaw with information concerning a telephone and file cabinet.
* I tolerate doing the Federal Programs and Curriculum Coordinator work and not receiving more benefits or pay.
* I tolerate watching you blatantly and racially discriminate against other individuals DYS School District 210.
* I [illegible] the office confusion that often occurs because I am willing to assist and communicate with other employees.
* I [illegible] not being offered or issued a Gateway Laptop Computer on February 2, 2006.
* I [illegible] being retaliated against, unfairly treated and alleged of violation of ethics [sic] because I [illegible] aware that it was unfair for a Secretary to be issued a Gateway Laptop and no other [illegible] serving as a Secretary for DYS School District 210 was offered or issued one.
* I [illegible] being accused of a violation of ethics: In order for me to file the document, I had to look and [illegible] to see where the [illegible] that particular document. I do not feel that I have violated any ethics [illegible] the inventory Property Form.

According [illegible] in July 2005, I was informed that only the teachers would receive the Gateway Laptop Computer [illegible] Federal Funds that was allotted [sic] specifically in the grant for teachers. ...

[12] DYS Grievance Procedure Policy 3.13.1

Smitherman met with Carr as soon as practicable on April 13, 2006, to discuss Carr's concerns. Smitherman told Carr that the meeting was being recorded. Moreover, and the recorder was open and obvious on Smitherman's desk. The audio taped record of the conversation demonstrates that while Smitherman attempts to discuss each allegation with calmness and sincerity, Carr's tone of voice continues to rise throughout the conference until she clearly becomes angry and hostile.[13] Similar behavior was demonstrated by both Smitherman and Carr at the hearing. Smitherman spoke calmly whereas Carr was more defiant and demonstrated she made no realistic attempt to try and resolve her issues with Smitherman.

Smitherman attempted to address each of Carr's accusations.[14] Smitherman explained that when determining the assignment of equipment such as telephones and computers and software, DYS takes into consideration an employee's job duties. Naturally, DYS gives priority to those employees whose job duties necessitate certain resources to perform their assigned tasks. Smitherman explained that Carr improperly contacted unrelated employees about the assignment of various DYS equipment. Smitherman also explained that when information regarding the appropriation of resources is distributed outside necessary channels, it disrupts the work environment. Thus, Carr acted outside the scope of her duties when contacting other ASA's to see if they had been assigned

---

[13] DYS Ex. 7.

[14] Smitherman testimony.

laptop computers.

Additionally, Smitherman explained that even though she had previously cautioned Carr about maintaining confidentiality of the records which came across her desk and following DYS policy instructions (such as grievance procedures), Carr nevertheless, copied this "grievance" to unnecessary employees outside the chain set forth in DYS policy. Smitherman explained that normally grievances are submitted initially only to the direct supervisor, giving the employee and the supervisor an opportunity to resolve the issue. Instead, Carr also sent it to the director, deputy director and others.[15] Throughout the conference, Smitherman testified that Carr pointed her finger and shook her fist at Smitherman. Carr also makes ridiculous demands such as more holidays and more time off of work.

Smitherman discussed each of the claims in detail. First, Carr complained that in 2004 she initially worked in an area where some boxes had to be stored, Smitherman testified that Carr's temporary work station at a table in that area has long since been resolved. More importantly, DYS Grievance Procedure mandates that "within five days of the event, the aggrieved employee should discuss the matter with his immediate supervisor." Clearly events taking place more than two years ago were time barred. Additionally, Smitherman did not supervise Carr at

[15] The DYS grievance procedure is contained in DYS Ex. 8. The memorandum prepared by Smitherman in DYS Ex. 8 explains that the majority of the complaints are not grievable because they are either time barred per DYS Policy 3.13.1 or because they did not involve incidents between Carr and Smitherman. With regard to Carr's complaint about not receiving more pay for her work with Federal Programs, Smitherman explained that this work is, and has always been part of Carr's job description. Carr's Pre-Appraisal specifically states that Carr's responsibilities include assisting with writing, completing forms and reports, calculating data, interacting with individuals, reading files, typing written and electronic communications, documentation and other paperwork according to oral and written instructions and DYS policy. Smitherman provided detailed responses and counseling on every issue.

the time.

Smitherman adamantly and convincingly denied any discriminatory motive. Nearly all of Carr's complaints were made long after the five day period expired, (some even years later) or did not involve Smitherman's supervision. Thus, the vast majority of complaints failed to qualify as a "grievance" pursuant to DYS policy. Nevertheless, even had Carr timely submitted the charges, the allegations failed to state any substantive claim or present a valid complaint against Smitherman.

Smitherman explained that Carr could not realistically fully perform her own duties and that of another employee. Thus, Smitherman instructed Carr to perform the assignments made to her, before volunteering to assist other employees, such as Queen Barker who worked on STI statistics.[16]

Shockingly, Carr responded that Smitherman had no right to tell her not to help another employee even though the facts undisputedly demonstrate that Smitherman supervised Carr, was charged with the responsibility for making Carr's assignments and conducting Carr's Annual Performance Appraisal.

With regard to Carr's desire for Outlook Express, the weight of the evidence demonstrated that Carr was able to perform her job with another email program and did not require Outlook Express. The evidence fails to demonstrate that other similarly situated employees with Carr's identical job duties working with

---

[16] STI is a computer data base which manages the student's information. STITD is a data base which manages the teachers' professional development. These tracking databases record various statistical information. Carr had no responsibilities with managing the students' information other than simple numbers like populations.

Smitherman were awarded equipment based upon some discriminatory motive. Carr failed to establish any other similarly situated employee treated differently.

With respect to another employee, S.T., receiving a new phone and allegedly slamming the door to Carr's office, Smitherman explained that S.T. often slams doors around the office because she has cerebral palsy which handicaps one side of her body. S.T. usually walks with either a cane or walker. However, S.T. valiantly strives to completely take care of herself, and often refuses to park in the handicapped spot because she does not want people to feel sorry for her. Often S.T. cannot shut a door without slamming it and leans up against the wall when traveling down the hallway. No evidence demonstrated that Smitherman had knowledge or notice of a specific time when S.T. may have slammed Carr's office door. However, the weight of the evidence suggests that if S.T. did slam Carr's door, it was an unintended result of a handicap and not any form of racial or hostile harassment. Queen Barker, a friend and co-worker of Carr's, admitted to hearing Carr yelling at S.T. one day. Barker recalled a door slamming, however this alone does not establish that Carr was being harassed by anyone. Further, with regard to the phone assignment, the evidence demonstrated that S.T.'s assignment of a new phone was based upon need and job duty assignments, not any animosity or discriminatory motive toward Carr.

With regard to training, Carr complained of a need for secretarial and bookkeeping training, however Smitherman could not recall when Carr requested training necessary for the performance of Carr's duties which had been denied.

Smitherman explained that Carr performed a clerical job, thus detailed technical training for specialized software for STI fell far outside Carr's job description. Carr admitted to Smitherman that she was given the opportunity to go to a Microsoft Word workshop, yet Carr remained at home sick the day the training was offered.

With regard to Carr's complaint that she was asked to perform an ASA's work while the ASA watched a movie, the weight of the evidence demonstrated Smitherman had no knowledge or notice that the ASA watched a movie. In fact, Carr admitted Smitherman left the building during that time. When Smitherman returned, the evidence demonstrates Carr did not inform Smitherman about the movie until she submitted the untimely "grievance" at issue. Smitherman had no recollection of asking Carr to type anything for this particular ASA and Carr's credibility on the subject remains questionable.

Further, with regard to Carr's claim that she performed duties concerning the Federal programs and curriculum coordinator yet received no additional pay or benefits, Carr failed to explain how or why these particular duties enhanced her job performance. The weight of the evidence demonstrated responsibility for these Federal Programs were encompassed within her DYS duties initially explained to her.

Further, Carr claims that Smitherman made inventory assignments in a manner which Carr perceived to be discriminatory. Carr does not possess standing to raise issues involving third parties. Further, assignments of inventory were

duties relinquishe by Carr, thus the undisputed evidence demonstrates that Carr was complaining about matters outside her job duties, and to which she did not possess all the nec sary factual information regarding these assignments. Thus, her complaints, un formed opinion and commentary provide no basis for a personal grievanc .

Following Smitherman's April 13, 2006 meeting with Carr, Smitherman sent Carr a memor dum dated April 19, 2006, responding to her complaints.[17]

Next, on or ound April 17, 2006, Smitherman sent Carr an email letting Carr know that S herman would be out of the office and provided contact information, as w as instructions to go through some material and throw away certain informatic . Carr responded in an email on or around April 26, explaining that Carr was out the office from April 17- 21, 2006 due to a death in her family and providing ex s why she could not complete Smitherman's assignments.[18]

Next, as a r lt of Carr's refusal to perform assignments, yelling at her supervisor, insubo ination and disruptive behavior, Carr was given a reprimand on April 27, 2006, hich Carr refused to sign.[19] Carr was informed that she could resolve the situat by completing all directives assigned to her by Smitherman and refrain from igerent, aggressive, loud or insubordinate conduct. Still

[17] DYS Ex. 8.

[18] DYS Ex. 9; C testimony; Smitherman testimony. Carr tried to use as a basis for refusing to perform the assignment that beca Smitherman ha old Carr that she violated ethical policies concerning confidentiality of inventory records, Carr efusing to shre documentation involving social security numbers. Carr also did not want to perform any su task until her evance was fully resolved. At the time Carr responded, Smitherman had fully responded to concerns.

[19] DYS Ex. 1

Carr's behavior did not improve. On May, 1, 2006, Smitherman issued another reprimand to Carr for two instances of insubordination. On April 27, 2006, when Smitherman requested to meet with Carr formally, Carr refused. Again, that same day, Carr refused to complete assignments given to her by Smitherman. Smitherman instructed Carr again to refrain from inappropriate conduct. Carr refused to sign this written reprimand, as well.

On May 5th and 9th of 2006, Carr filed letters with the Director John Stewart about Smitherman. On May 10th, Carr also filed with Smitherman an "Addendum to her Grievance" adamantly refusing to perform Smitherman's directives and accusing Smitherman of harassment by making assignments.[20]

The evidence demonstrated Carr was loud and disruptive in the work place.[21] Dr. John Stewart, whose office is located close to Carr and Smitherman, testified at an administrative hearing on May 16, 2006 that he heard Carr yelling at Smitherman while in Smitherman's office. Yet Stewart did not hear Smitherman raise her voice.[22] Stewart also witnessed Carr refusing to meet with Smitherman and saying loudly and abruptly, "No, I'm not going to [meet with Smitherman]" and walking out of Smitherman's office on May 1.[23]

Throughout April and May, Carr refused to perform even the most mundane

[20] DYS Ex. 14 & 15.

[21] DYS Ex. 15.

[22] DYS Ex. 16, Transcript pp. 244 - 246.

[23] DYS Ex. 16, Transcript pp. 246 - 266.

assignments such as drafting letters. For instance, Smitherman asked Carr to draft a standard memorandum, which had been done before, on April 21 regarding various staff awards. These federal funds were specifically designated for technology and the recipients had to comply with certain federal funding requirements. Carr had drafted the previous years' letters, but this time, Carr sent the assignment back and told Smitherman to write it herself. Carr wanted Smitherman to draft the exact words that Smitherman wanted in the letter and only then would Carr type it. Generally, these standard form type letters for federal funding grants and awards are done every year. The evidence demonstrated no legitimate reason why Carr could not perform this task. In another instance, since Carr had developed dividers for Dr. Stewart's policy manual, Smitherman asked Carr to provide the same dividers for Smitherman's policy manual. This was the only assignment that Smitherman made that day. Nevertheless, Carr only responded something to the effect, "why have I got to do it today, why do I have to do it." Carr was packing up Easter eggs and office decorations at the time and had no other assignments.

Ultimately, Carr completely refused to talk or meet with Smitherman, and instead told her supervisor that if Smitherman had anything to say, just to put it in Carr's mailbox.

Finally, since Carr and Smitherman had reached an impasse, Smitherman had no other choice but to recommend Carr's termination.

**THE EMPLOYEE'S PERSONNEL FILE**

The Employee's personnel file demonstrates the following Annual Performance Appraisal Scores out of a possible 40:

| Dates | Responsibility | Disciplinary | Total | Category |
|---|---|---|---|---|
| 9/2004-9/2005 | 38.3 | 0 | 38.3 | Exceeds Standards |
| 9/2003-9/2004 | 26 | 7[24] | 19 | Meets Standards |
| 9/2002-9/2003 | 30 | 0 | 30 | Exceeds Standards |
| 9/2001-9/2002 | 30 | 0 | 30 | Exceeds Standards |
| 9/2000-2/2001 | 30 | 0 | 30 | Exceeds Standards |
| 5/2000-11/2000 | 29 | 0 | 29 | Exceeds Standards |
| 6/1999 to 12/1999 | 27.5 | 0 | 27.5 | Exceeds Standards |

## III. ISSUE

Did the Department produce sufficient evidence to warrant dismissal of the Employee for violations of DMH policy for failure to perform her job properly, insubordination and disruptive conduct?

## IV. DISCUSSION

**Standard of Review**

The purpose of the Administrative Appeal is to determine if the termination of the Employee is warranted and supported by the evidence. *Kucera v. Ballard*,

---

24 Employee's appraisal notes noncompliance in the "Compliance with Rules" category. The appraisal documents a reprimand for failing to obtain approval for two days in which she failed to report for work, even though her supervisor verbally told her that he could not approve the time off. The Employee refused to sign the evaluation. In a memorandum dated July 13, 2004, Phyllis L. Rankins, Carr's supervisor wrote that Carr expressed "her displeasure" about her new work schedule to another supervisor, Mr. Smith. When Smith informed Carr that he could not approve leave requested by Carr, she "became irate" stating that she was not prepared to work and would be remaining home. Rankins reprimanded Carr for failure to follow DYS policy.

485 So. 2d ... (Ala. Civ. App. 1986); *Thompson v. Alabama Dept. of Mental Health*, 47... 427 (Ala. Civ. App. 1985); *Roberson v. Personnel Bd. of the State of Alaba...*, 390 So. 2d 658 (Ala. Civ. App. 1980). Recently in *Earl v. State Personnel Board*, slip op, 2030508 (March 14, 2006) the Alabama Court of Civil Appe... ...rated:

> "...smissal by an appointing authority ... is reviewable by the personnel board only to determine if the reasons stated for the dismiss... ...re sustained by the evidence presented at the hearing."

Slip op. at p. ... quoting *Johnston v. State Personnel Bd.*, 447 So. 2d 752, 755 (Ala. Civ. ... ...83).[25]

In det...ining whether an employee's dismissal is warranted, the departmental ...ency bears the burden of proving the charges warrant termination by a "prep...rance of the evidence." The law is well settled that a "preponde... of the evidence" standard requires a showing of a *probability* that the Emplo... guilty of the ac... as charged. Thus, there must be more than a mere possibi...y or one possibility among others that the facts support the disciplinar... ...ion at issue, the evidence must establish that *more probably than not*, the Em...ee performed, or failed to properly perform, as charged. *See Metropo... ...evedore Co. v. R...bo*, 521 U.S. 121, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (19... holding that a "...nificant possibility" falls far short of the APA's preponder... of the evidence standard; *See also Wright v. State of Tex.*, 533

[25] Th... ...ama Court of Civil Appeals went further to hold: "both this court and the circuit court must take the adm... ...agency's order as 'p... ...cie just and reasonable' and neither this court nor the circuit court may 'substit... ...gment for that of the a...ncy as to the weight of the evidence on questions of fact." Slip op at 27, citing Al... 1975, § 41-22-20 (k); ...te Dept. Of Human Res. v. Gilbert, 681 So. 2d 560, 562 (Ala. Civ. App. 1995).

F.2d 185 (5th r. 1976)[26]

**The rtment Proved identiary Facts Warranting Termination**

In th sent case, the De rtment substantiated that Carr began refusing assignments l responsibilities from January through May of 2006. Thus, Carr clearly fail perform her job operly. Next, by yelling at her supervisor, sending b s critical memor ums to unrelated parties, attempting to create issues am out the distribut of inventory and the other disruptive and insubordin onduct detailed herein, the Department demonstrated by the great weight of vidence, facts jus ing termination. Despite repeated instructions, Carr's beh was not only dis ptive and insubordinate, but openly hostile, aggressive d harassing tow her supervisor.

Acc gly, the undersig d finds the totality of the evidence warrants terminati his cause. Ther , the undersigned recommends to the State Personnel rd that the dismis be UPHELD.

Don is the 14th day of ecember, 2006.

JULIA JORDAN WELLER
Administrative Law Judge
State of Alabama
Personnel Department
64 North Union Street
Montgomery, Alabama 36130
(334) 242-3451
(334) 353-4481

[26] Bo City of Pritchard, 661 1206, 1209 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent all ircuit decisions handed n prior to the close of business on September 30, 1981.

**VIA FACS[illegible]E AND UNIT[illegible] STATES MAIL**

Jason Manas[illegible] Esq. - **Attorney [illegible] Ruby Carr**
Alabama Sta[illegible] Employees Associ[illegible]on
110 North Ja[illegible]son Street
Montgomery[illegible] L 36104
FAX: 832-[illegible]

T. Dudley [illegible], Jr.- **Attorney f[illegible] DYS**
Alabama De[illegible]ment of Youth S[illegible]vices
Post Office [illegible]66
Mt. Meigs, [illegible]6057
Telephone: [illegible]) 215-3803
Fax (334) 2[illegible]372

Case 2:07-cv-00532-MHT-SRW Document 6-2 Filed 08/30/2007 Page 4 of 8

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Ac[illegible] `1974; See Privacy Act Statement before completing this form.

AGENCY
[ ] FEPA
[X] EEOC

CHARGE NUMBER
420-2007-01091

and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | | HOME TELEPHONE (Include Area Code) |
|---|---|---|
| Ruby H. Carr | | (334) 864-0576 |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| 5211 County Road 28 | Lafayette, AL 36862 | 06-22-1965 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|---|
| Alabama Department of Youth Services | | 500+ | (334) 215-3807 |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY | |
| 100 Industrial Road | Mt. Meigs, AL 36057 | Montgomery | |
| NAME | | TELEPHONE (Include Area Code) | |
| | | | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY | |
| | | | |

DEC - 8 2006

BIRMINGHAM DISTRICT OFFICE

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[ ] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[ X ] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
Earliest
Latest 6/23/2006
[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I am an African American female citizen of the United States. I was employed with the Alabama Department of Youth Services for seven years as a Youth Services Aide until my unlawful termination on June 23, 2006. The reasons given for my termination were "failure to perform properly, insubordination and disruptive conduct. I believe that my termination was in retaliation for me filing a prior EEOC charge in March 2005 (130-2005-01900) and the settlement of same in October 2005.

In March, 2005, I filed a Charge of Discrimination based on race and sex discrimination and retaliation against Respondent. At the time of my filing, Tracy Smitherman, a white female, was my supervisor. She remained my supervisor until June 23, 2006. As a result of that charge, I entered into a negotiated Settlement Agreement ("Agreement") with Respondent in October, 2005. I believed that the terms of the Agreement

CONTINUED ON THE NEXT PAGE

[ ] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

Date Dec. 7, 2006 Ruby H. Carr Charging Party (Signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

EEOC Form 5 (Test 10/94)